The NORTHERN TRUST COMPANY, Plaintiff and Counterdefendant,

v.

E.T. CLANCY EXPORT CORPORA-TION, Defendant and Counterplaintiff,

and

E.T. Clancy, Defendant.

No. 85 C 6.

United States District Court, N.D. Illinois, E.D.

June 19, 1985.

Paul W. Schroeder and Edward R. Gower, Isham, Lincoln & Beale, Chicago, Ill., for plaintiff and counterdefendant.

John P. Ryan, Jr., Geoffrey G. Gilbert and Steven B. Varick, McBride, Baker & Coles, Chicago, Ill., for defendant and counterplaintiff.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Northern Trust Company ("Bank")[1] has sued E.T. Clancy Export Corporation ("Exporter") and its president E.T. Clancy ("Clancy") to recover amounts outstanding on two notes Bank purchased from Exporter. Now Bank moves under Fed.R.Civ.P. ("Rule") 12(c) for a judgment on the pleadings on the issue of liability under Counts II through IV of its four-count Amended Complaint (the "Complaint"). For the reasons stated in this memorandum opinion and order, Bank's motion is granted as to Counts II and III and denied without prejudice as to Count IV. ·

### Facts[2]

In January 1982 Bank agreed with Exporter to finance sales of equipment to certain Mexican corporations ("Buyers"). Under that agreement Bank was to purchase from Exporter notes issued by Buyers in a total principal amount not to exceed $1,239,257.50, with interest computed at ½% per annum over Bank's floating prime rate. To guarantee payment on the notes Exporter was to obtain insurance against Buyer's default from the Foreign Credit Insurance Association ("FCIA") and Export-Import Bank of the United States (collectively "Insurers"), and to assign the proceeds of the insurance policy to Bank. Under the terms of the policy Insurers were to pay the notes to the extent of (1) 100% of any unpaid principal amount, plus interest at 6%, if the cause of the default was "political" and (2) 90% of any unpaid principal, plus interest at 6%, if the cause of the default was "commercial."

On January 22, 1982 Buyers issued a note payable to Exporter in the principal amount of $618,757.50, with interest at the prime-linked rate (the "First Note"). Payments were to be made in twelve approximately equal quarterly installments. Three days later Exporter and Bank entered into a Promissory Note Purchase Agreement (the "Agreement"), which included the following paragraph (the emphasized portion indicates language typed in with a different type face and juxtaposed to the handwritten initials "ETC"[3]):

4. All Notes acquired by the Bank will be purchased with full recourse to the Exporter for the uninsured amount or any amount not recovered under the FCIA policy, *including any interest rate differential or unrecovered past due interest.*

1. This and other defined terms differ somewhat from the parties' usages in their memoranda on the current motion. This Court has instead opted to follow the designations used in the January 25, 1982 Promissory Note Purchase Agreement discussed later in the text.

2. Because Bank seeks judgment on the pleadings, all well-pleaded factual allegations in defendants' Answer and Counterclaim are taken to be true, while all contravening allegations in Bank's Complaint and Answer to Counterclaim are deemed false. 5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1368, at 691–95 (1969 & supp.1985). This opinion's factual recital reflects those principles (without, of course, implying any findings to that effect).

3. Although this Court has been provided only photocopies of the executed documents, the "ETC" script initials bear a strong resemblance to the corresponding capital letters in Clancy's admitted full signatures on other documents. Yet Clancy's Answer Count I ¶ 11 alleges:

Clancy further states that he is unable to admit that he initialed the change to paragraph 4 of the document a copy of which is Exhibit B to the amended complaint, because he has no memory of having initialed it and believes that he did not initial it.

Both Clancy and his counsel had better be careful about that kind of inherently suspect allegation. If it turns out to have been groundless, Rule 11 and perhaps other potential sources of sanctions may come into play as to either Clancy or the lawyers or both.

By its terms the Agreement covered only the First Note, which was endorsed over to Bank by means of an unrestricted endorsement: "Pay to the Order of The Northern Trust Co." Bank purchased the first note from Exporter as endorsed.

At the same time the Agreement was executed, Clancy signed an undertaking (the "Guaranty") guaranteeing personally the prompt payment of any amount due Bank from Exporter.[4] Under the Guaranty Clancy also agreed to pay any expenses incurred by Bank in collecting amounts owing from Exporter or in enforcing the Guaranty. But the Guaranty expressly provided:

> The right of recovery against the undersigned is, however, limited to the amount of $61,875.75 plus the interest on such amount and plus all expenses hereinbefore mentioned.

Less than two months later (on March 15) Buyers issued another note payable to Exporter (the "Second Note"), with terms matching those of the First Note except for its principal amount: this time, $306,446.25. Several days later Exporter endorsed the Second Note:

> Pay to the Order of Northern Trust Co. 90% without recourse, 10% with recourse.

With that endorsement, Bank purchased the Second Note from Exporter without the parties having executed any amendment to the Agreement or a separate note purchase agreement.

Buyers defaulted on both the First and Second Notes, and Bank then filed a claim with Insurers. Characterizing the default as resulting from "political" causes, Insur-

ers paid 100% of the principal amount outstanding on both Notes plus interest at 6%. But because the notes by their terms had accrued interest at the substantially higher rate of ½% over Bank's floating prime rate, large amounts remained due on the notes: $181,935.21 on the First Note and at least $38,998.40 on the Second Note.[5] Bank made demand on Exporter for both amounts, but Exporter refused payment, contending it was not liable for the deficiencies. Bank then filed this action.

### Contentions of Parties

Bank's Complaint alleges four theories of recovery:

1. Count I alleges Agreement ¶ 4 obligates Exporter to make up any difference between the total amount due and owing on the First Note and the insurance proceeds paid Bank by Insurers after Buyers' default.

2. Count II seeks recovery from Clancy on the Guaranty: its stated limit of $61,875.75 plus attorneys' fees, costs and expenses incurred in the enforcement of the Guaranty.

3. Count III alleges Exporter's endorsement of the Second Note makes Exporter liable to Bank for any deficiency resulting from Buyers' default, to the extent of 10% of the total amount (principal plus interest) payable on the Second Note.

4. Count IV seeks recovery of amounts due and owing on the First Note on Exporter's blank endorsement of the instrument.

---

**4.** This characterization of the Guaranty is drawn from Complaint Count II ¶¶ 16–17, admitted in that respect by Answer Count II ¶¶ 16–17. This Court is however constrained to observe the Guaranty itself (Complaint Ex. C) literally involves Clancy's guaranty of obligations owed to Bank by "E.T. Clancy" as Debtor. Such an arrangement (a person's "guaranty" of his own obligations) is commercially nonsensical, and the parties' pleadings appear to have treated that as an obvious clerical error in place of the clearly-intended individual guaranty of the corporate indebtedness. It is true defendants' Mem. 15 n. 14 does advert to the matter and to the document's deviation from

the "probable intent of the parties." But because the current motion is for judgment on the *pleadings*, defendants' admission in their Answer controls.

**5.** That figure apparently represents 10% of the total amount payable on the Second Note—the "recourse" percentage under that note's endorsement to Bank. It may be the actual amount still owing on the Second Note—equal to the differential between the 6% interest paid by Insurers and the floating rate stated in the instrument—exceeds that figure.

Bank's motion for a Rule 12(c) judgment on Counts II through IV claims the First Note, Second Note and Guaranty unambiguously establish Exporter's and Clancy's respective liabilities for the claimed amounts. On the other hand, defendants argue the Agreement, First Note, Second Note and Guaranty, read together, are susceptible of more than one interpretation. As a consequence, defendants contend, a determination of the parties' obligations under the documents is impossible without reference to extrinsic evidence, foreclosing judgment on the pleadings alone.

## Count IV

Because the parties have failed to address Illinois case law[6] that appears to bear directly on Bank's Count IV claim, this Court declines at this juncture to chart a course through the parties' contract law arguments on that count. Section 3–414 of Illinois' version of the Uniform Commercial Code (Ill.Rev.Stat. ch. 26, ¶ 3–414[7]) provides a blank endorsement on a negotiable instrument constitutes the endorser's engagement:

> that upon dishonor and any necessary notice of dishonor and protest he will pay the instrument according to its tenor at the time of his indorsement to the holder or to any subsequent indorser who takes it up....

But the First Note is not a negotiable instrument. Under Code § 3–104 a writing is not a negotiable instrument unless among other things it contains "an unconditional promise or order to pay a sum certain in money." Code § 3–106 goes on to list various contingencies in spite of which the sum payable on an instrument is a "sum certain." Code Comment 1 to Code § 3–106, which Illinois has adopted, describes the purpose of that section (emphasis added):

The section rejects decisions which have denied negotiability to a note with a term providing for a discount for early payment on the ground that at the time of issue the amount payable was not certain. It is sufficient that at any time of payment the holder is able to determine the amount then payable from the instrument itself with any necessary computation. Thus a demand note bearing interest at six per cent is negotiable. A stated discount or addition for early or late payment does not affect the certainty of the sum so long as the computation can be made, nor do different rates of interest before and after default or a specified date. The computation must be one which can be made from the instrument itself without reference to any outside source, and *this section does not make negotiable a note payable with interest "at the current rate."*

█ Interest payable on the First Note cannot be computed without reference to Bank's prime rate in effect from time to time. Under prevailing law that renders the sum payable uncertain and the instrument itself nonnegotiable. See F. Hart & W. Willier, *Commercial Paper Under the Uniform Commercial Code* § 2.11[1], at 2–98 to –99 (1985); 4 W. Hawkland & L. Lawrence, *Uniform Commercial Code Series* § 3–106:03, at 95 & n. 5 (1984). Accordingly the First Note is outside the purview of Article 3 in general and Code § 3–414 in particular.[8] Resort must be had to the Illinois common law to determine the legal effect of Exporter's endorsement of the First Note.

Early Illinois cases raise serious doubt whether blank endorsement of a nonnegotiable instrument makes the endorser liable upon the obligor's default. *Smith v. Myers,* 207 Ill. 126, 127, 69 N.E. 858 (1904) considered the effect of blank endorsement of a note promising payment on a specified

---

**6.** Each of the documents—the First Note, Second Note and Guaranty—specifies it shall be deemed made under Illinois law.

**7.** Citations to chapter 26 will simply take the form "Code § ..."

**8.** It bears noting the First Note does not fall within the ambit of Code § 3–805, which extends most provisions of Article 3 to instruments that are not negotiable solely because they are not payable to order or to bearer.

date of a fixed principal amount "with interest at six per cent per annum and taxes." Because the amount of taxes payable remained uncertain, *Smith* held the instrument was not by any general definition a promissory note (*id.* at 131, 69 N.E. 858):

> [I]n order to constitute a promissory note the instrument must be for a specified sum or certain sum of money.

Consequently *Smith, id.* at 130, 69 N.E. 858 said the instrument was not covered by the common-law rule (now embodied in the Code) that a blank endorsement on a promissory note constituted the endorser's warranty to pay the note if the principal obligor did not:

> Upon a mere contract for the payment of money or the performance of any other covenant, where the instrument is not such as comes within the definition of a negotiable instrument, one by merely signing his name upon the back thereof does not become either a guarantor or an endorser, within the law merchant.

See also *First National Bank of Cass Lake v. Lamoreaux*, 255 Ill.App. 15, 19–20 (1st Dist.1929) (adhering to *Smith*); Annot., 79 A.L.R. 719, 728 (1932).

While those are older cases whose reasoning runs against the heavy weight of authority in other jurisdictions, see Annot., 79 A.L.R. at 723–28, they cannot now be ignored by this Court.[9] If those cases control, the nonnegotiability of the First Note (for much the same reason found controlling in *Smith*) would mean Exporter's blank endorsement does not by itself render it liable to Bank. Instead liability vel non must be established by reference to evidence of the actual agreement between the parties. See *Smith*, 207 Ill. at 130, 69 N.E. 858.

9. *Erie v. Tompkins* obliges this Court to search for Illinois law. That search is not of course necessarily ended with the discovery of cases of ancient vintage, if there are reasons to believe current consideration of the problem by the Illinois Supreme Court would produce a different result. See *Williams, McCarthy, Kinley, Ruda & Picha v. Northwestern National Insurance Group*, 750 F.2d 619, 624 (7th Cir.1984);

Of course reference to the Agreement might well establish Exporter consented to some measure of liability on the First Note. But that possibility stands beyond the ken of this opinion, for (1) Bank's current motion does not address the Count I claim and (2) Count IV looks only to Exporter's blank endorsement of the First Note.

At least until the parties have adequately explored the issues identified in this opinion, prudence forbids entry of judgment on the Count IV claim. Accordingly Bank's motion is denied as to Count IV, though without prejudice to its renewal "within such time as not to delay trial" (Rule 12(c)).

### Count III

Bank's Count III claim, founded on Exporter's endorsement of the Second Note, is not subject to the same treatment as the Count IV claim. Here Exporter's endorsement was not in blank. Instead the endorsement itself specified the terms of the actual agreement between the parties by means of the phrase "90% without recourse, 10% with recourse." That phrase leaves no doubt Exporter was meant to have some secondary liability on the Second Note.

In this instance the ground of dispute shifts to the extent of the intended liability. Bank contends Exporter was to be liable for 10% of the total amount payable on the Second Note. Exporter maintains it was to be liable for any deficiency on the Second Note only if Insurers characterized Buyers' default as resulting from "commercial" causes. Exporter proposes to prove that account of the parties' agreement by extrinsic evidence.

■ Unquestionably the Second Note (perhaps by itself, but surely if taken to-

*Indianapolis Airport Authority v. American Airlines, Inc.*, 733 F.2d 1262, 1271–72 (7th Cir. 1984). But *Erie* does not mandate this Court to conduct that search on its own. It is distressing enough for the analysis and search for authorities discussed in the text to have been forced upon this Court's law clerk, Willis Buck, Esq. This Court will not compound the burden by sparing the litigants their task any further.

gether with the First Note, Agreement[10] and Guaranty) represents at least a partial integration of the agreement between the parties. What is at stake is the construction of the writing. To that end the parol evidence rule provides evidence of prior or contemporaneous transactions or facts may be admitted to ascertain intent only if the writing is ambiguous. Otherwise "an agreement must be given a fair and reasonable interpretation by the courts based on a consideration of the language and provisions contained therein." *Arthur Rubloff & Co. v. Comco Corp.*, 63 Ill.App.3d 362, 367, 20 Ill.Dec. 338, 342, 380 N.E.2d 15, 19 (2d Dist.1978).

In that light the Second Note endorsement gives no pause. Though laconic it is not ambiguous. To any reasonable reader it imports Exporter's liability for up to 10% of the total amount payable on the Second Note if Buyers default. By itself the endorsement provides no basis whatever for defendants' proposed interpretation. Nor is defendants' ill-labeled "middle ground" reading (Def.Mem. 13)—that Exporter is liable for 10% of any deficiency on the Second Note—at all plausible. It would distort normal language to read the endorsement as limited to any unrecovered portion of the Second Note rather than as applying to the Note itself. In short, the endorsement's clear effect is to treat the Second Note as though comprising two amounts, one 90% and the other 10% of the total amount payable on the Second Note— and the endorsement plainly says the first of those amounts stands without, and the

second stands with, recourse against the endorser.

Nor is that reading contradicted or narrowed by anything in the First Note, Agreement or Guaranty. Under the endorsement on the First Note and the language of Agreement ¶ 4, Bank is to have recourse against Exporter for "any amount not recovered on the FCIA policy." That language by its terms imposes greater First Note liability on Exporter than the Second Note endorsement. Nothing about Bank's having, by choice or inadvertence, purchased the Second Note with lesser recourse against Exporter creates any ambiguity as to the later document. By the same token, the dollar recovery limit incorporated in the Guaranty does not cast doubt on the meaning of the Second Note endorsement.[11] While perhaps—as defendants contend—the recurrence of the 10% figure in these documents and the terms of Agreement ¶ 4 reflect broader discussions than the documents themselves portray, the parol evidence rule bars introducing evidence of such discussions to vary or contradict the clear terms of writings that constitute at least a partial integration of the parties' contract. To ascertain Exporter's obligations under the Second Note as endorsed, this Court may not inquire into evidence dehors the Note.

■ In sum, the pleadings raise no issue of fact as to the Second Note endorsement. Under Rule 12(c) Bank is entitled to a judgment on Count III for any amount due and owing on the Second Note, but not more than 10% of the total amount payable on the instrument.

---

**10.** There is a limited area of factual dispute as to Agreement ¶ 4. Defendants allege the words "including any interest rate differential or unrecovered past due interest" were added to the end of the paragraph without their knowledge or approval. Because on the current motion this Court must assume defendants can adduce facts to prove that allegation (but see n. 3), the challenged language will be ignored for present purposes. Accordingly the deposition testimony and other evidence outside the pleadings introduced by defendants may also be ignored, for it is addressed primarily to raising questions about the circumstances surrounding incorporation of the challenged language into the Agreement.

**11.** While the Guaranty fixes a dollar cap on Clancy's liability, it applies to *all* present or future indebtedness of the principal obligor to Bank. It would do violence to language to allow the clear language of a note executed nearly two months later to be altered by inferences sought to be drawn about the source of the original dollar cap. In a way, the very existence of the earlier document creates the inference that if the parties intended to have the later document (the Second Note) mean something different from its plain language, they had to say so specifically—and they did not.

*Count II*

There is no dispute between the parties as to construction of the Guaranty. Rather Clancy opposes Bank's motion by contending Bank's failure to establish Exporter's liability precludes recovery on the Guaranty.

Because Clancy's liability is concededly derivative, this opinion's holding (or more accurately non-holding) on Count IV does bar recovery on the Guaranty as to the First Note. But this opinion has gone on to rule Exporter liable on its endorsement of the Second Note to Bank. Accordingly Bank may proceed against Clancy on the Guaranty on the same liability, subject only to the express limit on recovery under the Guaranty. Of course Bank may only collect that sum once, whether from Exporter on the Second Note or from Clancy on the Guaranty.[12]

*Conclusion*

Bank's Rule 12(c) motion for a judgment on the pleadings as to liability is granted as to Complaint Counts II and III. It is denied without prejudice as to Complaint Count IV.

---

**12.** In conventional guaranty language, the Guaranty does not require exhaustion of remedies (or even commencement of proceedings) against the principal debtor.