**NEW CONNECTICUT BANK & TRUST COMPANY, N.A., as Assignee of the Federal Deposit Insurance Corporation, as Receiver of The Connecticut Bank and Trust Company, N.A., Plaintiff,**

v.

**STADIUM MANAGEMENT CORPORATION, et al., Defendants.**

**Civ. A. No. 86–2377–T.**

United States District Court, D. Massachusetts.

July 3, 1991.

Pamula Berman, Thomas F. Maffei, Choate, Hall & Stewart, Boston, Mass., for plaintiff.

Gary W. Cruickshank, Boston, Mass., for Stadium Management Corp.

## MEMORANDUM

TAURO, District Judge.

### I

### *Introduction*

Plaintiff New Connecticut Bank and Trust Company, N.A. ("CBT" or "Plaintiff") brings this action to recover approximately ten million dollars allegedly due as the result of a default by defendant Commonwealth Sports Properties, Inc. ("CSP") on four different promissory notes (the "Notes"). CBT also seeks to recover against defendants Patrick Sullivan, William Sullivan, Charles Sullivan, and John Charlton (collectively, the "Guarantors") on several guarantees (the "Guarantees").

Both the Notes and the Guarantees were issued originally to Connecticut Bank and Trust Company, N.A. Connecticut Bank and Trust later became insolvent. The Federal Deposit Insurance Corporation ("FDIC"), as receiver of Connecticut Bank and Trust, then took possession of the Notes and the Guarantees. The FDIC, thereafter, assigned the Notes and Guarantees to CBT.

Both CSP and the Guarantors admit execution of the loan documents, and admit that they have made no payments to CBT. CBT now seeks summary judgment on the grounds that all defenses asserted by CSP and the Guarantors fail as a matter of law.

The defendants have raised the following affirmative defenses: impairment of collateral, accord and satisfaction, estoppel, and waiver. CBT argues that there is no evidence to support two of these defenses, estoppel and waiver. As the defendants neither contest this argument nor advert to any evidence that would support those defenses, CBT is entitled to summary judgment on these issues. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (moving party satisfies

summary judgment burden when it demonstrates that no evidence on record supports opponent's position).

An analysis of the defendants' two remaining defenses, impairment of collateral and accord and satisfaction, follows.

## II

### *Impairment of Collateral*

Defendants' impairment of collateral defenses are, in essence, lender liability arguments.[1] The defendants contend that CBT exercised such pervasive control over the operations of CSP that CBT is responsible for the decline in value of the collateral securing the loan. Specifically, the defendants argue that CBT controlled the operations of CSP through CBT's designated manager, Joseph Sullivan, and that Joseph Sullivan's managerial blunders caused the value of the CSP assets securing the loan to decline.

### A. *D'Oench* Doctrine

Plaintiff attacks the defendants' impairment of collateral defenses on the grounds that the *D'Oench* doctrine bars defendants from asserting them against the FDIC or its assignee, CBT. In *D'Oench, Duhme & Co., Inc. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1941), the Court held that, following the FDIC's takeover of a bank, the maker of a note cannot assert a defense to payment on that note against either the FDIC or its assignee, if that defense is based on an agreement not documented in the bank's files. Congress later codified this rule:

> No agreement which tends to diminish or defeat the interest of the Corporation

in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

> (1) is in writing,
>
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e).

This extraordinary protection serves two purposes. First, it allows bank examiners to rely solely on a bank's records in evaluating the worth of its assets. *See W.T. Langley v. FDIC,* 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987). Second, the contemporaneousness requirement "ensure[s] mature consideration of unusual loan transactions by senior bank officials, and prevent[s] fraudulent insertion of new terms, with the collusion of bank employees." *Id.* at 92, 108 S.Ct. at 401.

The First Circuit has recently declared "that *D'Oench* bars defenses and affirmative claims whether cloaked in terms of contract or tort, as long as those claims arise out of an alleged secret agreement." *Timberland Design, Inc. v. First Service Bank for Savings,* 932 F.2d 46, 50 (1st

---

1. CSP's second defense contends that "[t]he obligations of CSP ... were discharged when CBT, throughout its management and control of its principal debtor, CSP, unjustifiably impaired, harmed, wasted and eventually nullified its security interest in the property of CSP." Answer of Commonwealth Sports Properties, Inc. at 6–7.

   The Sullivans' second defense asserts that "CBT failed to enforce its security interests in the collateral of the principals prior to seeking relief from the [Sulivans] in circumstances where CBT knew that its failure to do so would result in unusual hardship to the [Sullivans]."

The Sullivans' third defense is that their "obligations were discharged when CBT unjustifiably impaired, harmed, wasted and eventually nullified the collateral securing the obligations allegedly covered by the guaranty agreement." Answer of Patrick J. Sullivan, *et al.* at 15.

Charlton's seventh defense claims that "[b]y reason of positive injurious acts of CBT in interfering with the sale of Sullivan Stadium, CBT has made it more difficult for CSP to repay the $200,000 Note and has increased the risk to Charlton under his guarantee...." Answer of John F. Charlton, Jr. at 10.

Cir.1991) (rejecting suggestion in *Astrup v. Midwest Fed. Sav. Bank*, 886 F.2d 1057, 1059 (8th Cir.1989) that *D'Oench* affords no protection against tort claims). There is virtually no case law, however, which discusses the question of whether *D'Oench* bars tort-based defenses that do not arise out of alleged secret agreements.[2]

Other circuits have held that the FDIC enjoys the rights of a holder in due course in cases involving negotiable instruments. *See FSLIC v. Murray*, 853 F.2d 1251, 1256–57 (5th Cir.1988); *FDIC v. Cremona*, 832 F.2d 959, 964 (6th Cir.1987). In establishing this general rule, the Fifth Circuit determined that

> providing [FDIC] with at least the status of a holder in due course promotes the necessary uniformity of law in this area while it counters individual state laws that would frustrate a basic [FDIC] objective: promoting confidence and stability in financial institutions. Moreover, clothing [FDIC] with at least holder in due course status does not trample commercial expectations of note makers.... A maker must anticipate that his note may be transferred to a holder in due course; the maker therefore suffers no prejudice if the [FDIC] is granted those rights.

853 F.2d at 1256–57. Nothing suggests that the Fifth Circuit's reasoning is any less valid in the context of an impairment of collateral defense. The *D'Oench* doctrine, therefore, bars the assertion of such a defense if the instruments in question are negotiable.[3]

■ To qualify as a negotiable instrument under Article 3 of the U.C.C., a writing must

> (a) be signed by the maker or drawer; and
>
> (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this Article; and
>
> (c) be payable on demand at a definite time; and
>
> (d) be payable to order or to bearer.

U.C.C. § 3–104, 2 U.L.A 17 (1977) (emphasis added).[4] Each Note requires payment of variable rates of interest.[5] *See* Memorandum in Support of Motion for Summary Judgment, Exhibits 1C, 1D, 1F, and 1G. Neither § 3–104 nor § 3–106,[6] which defines the phrase "sum certain," discuss whether a variable interest rate note may qualify as a promise to pay a sum certain. Nevertheless, several courts have concluded that an interest provision that cannot be

---

**2.** In *FDIC v. Blue Rock Shopping Center*, 766 F.2d 744 (3rd Cir.1985), the Third Circuit held that the maker of a note could assert an impairment of collateral defense against the FDIC based on the FDIC's own conduct with respect to the note after acquiring it. 766 F.2d at 753. *Blue Rock* provides limited guidance here, however, as subjecting the FDIC to liability for its own post-acquisition conduct does not affect the ability of bank examiners to determine a bank's worth pre-acquisition.

**3.** The parties do not address the question of whether the financial instruments at issue are negotiable.

**4.** The parties do not address the question of whether Connecticut or Massachusetts law would determine the negotiability of the financial instruments at issue. Nevertheless, the two states have enacted identical versions of U.C.C. § 3–104, and neither state's courts have published any opinions discussing whether variable interest rate notes qualify as negotiable instruments within the meaning of that section. This court, therefore, would reach the identical re-

sult under either Connecticut or Massachusetts law, and leaves unresolved the question of which of the two states' laws should properly apply to this issue.

**5.** The guarantees all contain conditional promises to pay in the event of a default and, as a result, do not satisfy § 3–104's unconditional promise requirement. *See* Memorandum in Support, Exhibits 1K, 1M, 1O, 1Q, and 1R.

**6.** § 3–106 provides, in pertinent part:

> (1) The sum payable is a sum certain even though it is to be paid
>
> (a) with stated interest or by stated installments; or
>
> (b) with stated different rates of interest before and after default or a specified date; or
>
> (c) with a stated discount or addition if paid before or after the date fixed for payment; or
>
> (d) with exchange or less exchange, whether at a fixed rate or at the current rate; or
>
> (e) with costs of collection or an attorney's fee or both upon default.

U.C.C. § 3–106, 2 U.L.A. 41 (1977).

determined without reference to an external, variable rate renders a note nonnegotiable. *See National Union Fire. Ins. Co. v. Cooper,* 729 F.Supp. 1423, 1436–37 (S.D.N.Y.1989); *Taylor v. Roeder,* 234 Va. 99, 360 S.E.2d 191, 195 (1987); *Northern Trust Co. v. E.T. Clancy Export Co.,* 612 F.Supp. 712, 715 (N.D.Ill.1985). This court agrees. Although variable rate notes have become increasingly common, this development in commercial practice does not dictate a change in standards for determining negotiability. Dubner, *Variable Interest Rates—Their Effect on Negotiability Under the U.C.C.,* 93 Com.L.J. 1, 13–15 (1988). The primary importance of the Uniform Commercial Code is the certainty and uniformity which it provides for commercial transactions. *Id.* Any deviations from traditional, accepted interpretations of the Code should, therefore, come from the legislature and not from the courts.[7] *See* Hiller & Ferris, *Variable Interest Rates and Negotiability—A Response,* 94 C.L.J. 48, 56 (advocating legislative, not judicial, action to establish the negotiability of variable interest rate notes).

■ Nevertheless, the nonnegotiability of the financial instruments in this case indicates merely that the FDIC does not enjoy the blanket protection of a holder in due course.[8] The question remains whether the *D'Oench* doctrine bars the defendants from the assertion of the particular defense of impairment of collateral against the FDIC. This court concludes that the *D'Oench* doctrine does not reach this far.

■ Both *D'Oench* and its statutory embodiment aim primarily at the evils of secret agreements. *See generally Timberland Design v. First Service Bank for Savings, passim* (analyzing purpose of doctrine). Here, the defendants do not allege a secret agreement, but rather assert that improper conduct by CBT damaged the value of the collateral. The purpose of the *D'Oench* doctrine is to promote proper documentation of financial obligations. The doctrine recognizes that the note maker or obligor has the information and the incentive to ensure contemporaneous recording of all details of the transaction.

7. In *Universal C.I.T. Credit Corp. v. Ingel,* 347 Mass. 119, 124, 196 N.E.2d 847 (1964), the Supreme Judicial Court held that a provision in a promissory note calling for "interest after maturity at the highest lawful rate" did not render the note nonnegotiable. A statutory provision explicitly indicated what the highest lawful rate was. The court pointed out that § 3–118 expressly provides that a note payable "with interest" shall be payable at the judgment rate of interest and that such a note is negotiable. *Id.* Finding the provision for payment at the highest lawful rate to be no less definite, the court held that the note at issue was also negotiable. *Id.*

*Universal* permits a negotiable instrument to provide for a rate of interest that, although not determinable from the face of the note, is immediately determinable by reference to a specified outside source. In the case of variable rate notes, however, the rate of interest, although also tied to a specified outside source, is not immediately determinable. *See* Official Comment to U.C.C. § 3–106 ("The section rejects decisions which have denied negotiability to a note with a term providing for a discount for early payment on the ground that at the time of issue the amount payable was not certain.... The computation must be one which can be made from the instrument itself without reference to any outside source, and this section does not make negotiable a note payable with interest 'at the current rate.'") This court, therefore, concludes that the Massachusetts Supreme Judicial Court would not extend negotiability to financial instruments with variable interest rates which could not reveal the sum due at maturity with certainty.

8. In *Sunbelt Savings v. Montross,* 923 F.2d 353, 356 (5th Cir.1991), the Fifth Circuit debated whether to extend the scope of its holding in *Murray* by providing holder in due course status to the FDIC for non-negotiable instruments. The Fifth Circuit acknowledged that the same policy arguments for furthering the FDIC's ability to ensure the sound, effective, and uninterrupted operation of banks apply in the case of non-negotiable instruments. 923 F.2d at 356. Nevertheless, the court concluded that "applying the doctrine to non-negotiable instruments is fundamentally different." *Id.* The court reasoned that, under the *D'Oench* doctrine as expounded in *Murray,* "the FDIC is protected from the disadvantages attendant upon its role, but the nature of the assets the FDIC receives from the institutions remains unchanged. Conversely, extending federal holder in due course protection to non-negotiable instruments would bestow a benefit on the FDIC by changing the assets' nature—actually enhancing their value." *Id.* This court agrees that such an extension would result in an undue windfall for the FDIC and, accordingly, declines to offer holder in due course protection to the FDIC or its assignees as holders of non-negotiable instruments.

The purposes of the *D'Oench* doctrine are not thwarted by recognition of a defense based upon negligent acts by a lender that have impaired the value of collateral securing a debt. A lender's negligence is not a detail of the transaction that a maker or obligor can predict, let alone record. The *D'Oench* doctrine, therefore, does not bar the defendants from asserting their impairment of collateral defense against CBT.

## B. *Issue Preclusion*

■ CBT also attacks defendants' impairment of collateral defense on a second ground. CBT argues that this court's prior dismissal of defendants' counterclaims alleging that Joseph Sullivan's negligence caused the value of The Raceway, a major CSP asset, to decline precludes the defendants from raising essentially the same argument as an impairment to collateral defense. While superficially appealing, CBT's argument ignores essential differences between the assertion of inadequacies in the pleading of the defendants' counterclaims and the sufficiency of the evidence currently on the record to sustain their affirmative defenses.

In its Memorandum and Order of May 20, 1988 dismissing the defendants' counterclaims, this court held that both the defendants' theories

> that plaintiff's role in the selection of Joseph Sullivan for the manager's position constituted unreasonable interference in CSP's affairs; [and] (b) that plaintiff's role in the selection of Joseph Sullivan rendered it responsible for his subsequent performance

failed to state causes of action. Memorandum at 5. In reaching this conclusion, this court noted that, in traditional lender liability cases, "the lender took control of, or at least actively interfered in, the debtor's operations." *Id.* at 6. This court contrasted this conventional pattern with the level of interference alleged in the counterclaim, in which "[t]he only connection alleged between Joseph Sullivan and plaintiff is that plaintiff designated Joseph Sullivan as its preferred candidate for the manager's position." *Id.* at 7. This court then went on to observe in a footnote that the defendants'

> allegations of control are wholly conclusory. The facts pleaded show only that plaintiff required that Joseph Sullivan be hired at the outset. The pleadings contain no facts showing that plaintiff subsequently exerted any control over CSP's operations, or over Joseph Sullivan's actions.

*Id.* at 7 n. 8.

In its opposition to CBT's motion for summary judgment, however, defendants do adduce some evidence that suggests CBT's control over CSP. In an interoffice memo, a CBT Vice–President describes CBT's workout strategy: "Our strategy is two-fold; *separate* CSP from Stadium Management and *control* all aspects of CSP's operations." Hoffman Affidavit, Exhibit 8 (emphasis in original). Similarly, a telephone call report contains the notation "CBT to control operation." Hoffman Affidavit, Exhibit 2. A "Watched Assets Report" states, "Upon restructuring of the loan, CBT will essentially control all aspects of the company's finances." Hoffman Affidavit, Exhibit 7. Moreover, the Affidavit of Patrick Sullivan indicates that CBT in fact exercised its authority under the March 4, 1985 Loan Agreement to monitor and approve each expenditure of CSP's cash proceeds. *See* Patrick Sullivan Affidavit at ¶ 2; Hoffman Affidavit, Exhibit 12 at 9. Although this evidence of actual control over CSP's operations is not dispositive, it does raise genuine issues of material fact sufficient to preclude the entry of summary judgment for plaintiffs.

## III

### *Accord and Satisfaction*

Defendant Patrick Sullivan's "accord and satisfaction" defense is, in fact, an allegation of either substantial discharge or set-off.[9] Patrick Sullivan alleges that he satis-

---

**9.** Defendants concede this pleading error. *See* Memorandum in Opposition to Motion for Summary Judgment at 28.

fied his obligation by the contemporaneous delivery of a five year irrevocable license from Stadium Management Corporation to CBT for the use of a New England Patriots' Skybox at Sullivan Stadium. He argues that the delivery of this license either discharges his obligations under the note or serves as a setoff against them.

As an initial matter, the *D'Oench* doctrine does not bar Patrick Sullivan from claiming that the license agreement satisfied his obligations. The license agreement satisfies the requirements of contemporaneous execution, approval by the bank's loan committee, and inclusion in the bank's files, and, therefore, Patrick Sullivan may base a claim of discharge or setoff upon it. *See FDIC v. State Bank of Virden*, 893 F.2d 139 (7th Cir.1990).

By its terms, however, the license agreement does not purport to discharge Patrick Sullivan from his obligation. The agreement merely provides that Stadium Management Corporation "hereby agrees that any and all amounts due ... under the License Agreement shall be deemed to be paid in full ... by crediting such amounts to the balance of the Demand Note...." Patrick Sullivan Affidavit, Exhibit C at ¶ 5. Patrick Sullivan cannot, therefore, avoid liability on the basis of this agreement. He can, however, argue that the credits resulting from this agreement have reduced the amount that he owes.

## IV

### Conclusion

The defendants have failed to identify evidence on the record to support their defenses of estoppel and waiver. Defendant Patrick Sullivan has also failed to demonstrate that discharge provides a defense to liability under his guarantee, although it might provide a basis for contesting the amount of any damage award. Nevertheless, the defendants' impairment of collateral defenses raise genuine issues of material fact that can be resolved only at a trial on the merits. Plaintiff's motion for summary judgment is, therefore, DENIED.

An order will issue.