**John VASAPOLLI, et al.,
Plaintiffs, Appellants,**

v.

**Steven M. ROSTOFF, et al.,
Defendants, Appellees.**

No. 94–1319.

United States Court of Appeals,
First Circuit.

Heard Sept. 13, 1994.
Decided Nov. 8, 1994.

Chester A. Janiak, with whom Andrew P. Botti and Burns & Levinson, Boston, MA, were on brief, for appellants.

Christopher J. Bellotto, Counsel, with whom Ann S. Duross, Asst. General Counsel, Robert D. McGillicuddy, Senior Counsel, Washington, DC, A. Van C. Lanckton, Laurie A. Parrott, and Craig and Macauley Professional Corp., Boston, MA, were on brief, for appellee F.D.I.C.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge and STAHL, Circuit Judge.

SELYA, Circuit Judge.

It is trite, but true, that not every wrong has a remedy—much less a remedy wholly satisfactory to the purported victims. This litigation illustrates the point in the context of an appeal matching the plaintiffs, a group of borrowers who complain that they were swindled, against the Federal Deposit Insurance Corporation (FDIC), in its capacity as liquidating agent for the now defunct Bank for Savings (the Bank). Specifically, plain-

tiffs challenge district court orders granting summary judgment against them in respect to (1) claims that they originally brought against the Bank, and (2) counterclaims pressed against them by the FDIC to recover amounts allegedly due on certain promissory notes payable to the Bank. In disposing of the matter, the district court wrote at some length, *see Vasapolli v. Rostoff,* 864 F.Supp. 215 (D.Mass.1994), and we agree with that court's central conclusions: plaintiffs' claims for fraudulent inducement, misrepresentation, and negligence are barred by the *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e); plaintiffs' claims of duress and fraud in the factum cannot survive scrutiny; plaintiffs' affirmative defenses to the counterclaims are impuissant; and none of the plaintiffs is entitled to benefit from a belated effort to interject into the decisional calculus an incorrectly computed figure contained in a writ of execution issued by a Maine state court in a related proceeding. Consequently, we affirm the judgment below.

## I. BACKGROUND

We abjure a detailed, fact-laden account in favor of a simple sketch. Because two of the orders that we are reviewing arose under the aegis of Fed.R.Civ.P. 56, we construct this sketch, and limn the material facts, in the light most hospitable to the appellants.

The myriad plaintiffs in this civil action are bound together by what appears in retrospect to have been a serious error in judgment: they all borrowed money from the Bank in connection with the purchase of condominium units from Steven M. Rostoff or business entities controlled by him. Although each plaintiff's predicament is slightly different, the record reveals a consistent pattern of chicanery practiced by Rostoff and certain bank employees. In a typical instance, a plaintiff purchased a condominium based on multiple misrepresentations by Rostoff such as: that the unit had been completely renovated and was being sold at a substantial discount from market value; that

the unit could be resold profitably through Rostoff at the end of one year; and that the unit owner would incur no out-of-pocket expenses during the period of his ownership. Bank officials abetted these misrepresentations in divers ways, including the procurement of inflated appraisals.

Rostoff's scheme climaxed in a string of high-pressure closings scheduled at 15–minute intervals on the Bank's premises. The plaintiffs received little notice of when the closings were to occur—many of them were held at night—and Rostoff did not provide them with the relevant documents until they arrived at the Bank. Rostoff appeared to have free run of the Bank's offices, sometimes opening the outer door to let purchasers enter.

Among other things, the plaintiffs allege that, although they had applied to the Bank for long-term loans, the actual documents presented to them for signature were short-term notes, each of which necessitated a balloon payment at the end of a one-year or three-year term.[1] If a plaintiff objected, he was told that he would lose his deposit unless he signed the papers then and there.

After they discovered Rostoff's cozenage, the plaintiffs ceased payment on the notes; the Bank foreclosed many of the mortgages; and federal prosecutors indicted (and eventually convicted) Rostoff and certain Bank employees on criminal charges. While the prosecution was still embryonic, a group composed of allegedly defrauded borrowers brought a civil action in a Massachusetts state court against Rostoff, the Bank, and other defendants.[2] In their suit, plaintiffs sought variegated relief under theories of fraud, conspiracy, breach of contract, negligence, racketeering, deceptive trade practices, and the like. The Bank counterclaimed, seeking recovery from the plaintiffs under their promissory notes. In response to the counterclaims, the plaintiffs asserted numerous affirmative defenses, averring,

---

1. Eleven plaintiffs extended the terms of their loans by subsequent written agreement with the Bank.

2. The complaint was subsequently amended to add additional plaintiffs and defendants. A total of 17 borrowers appear as appellants in this proceeding.

among other things, that they had been fraudulently induced to sign the notes.

The Bank capsized in March of 1992. The FDIC stepped in as liquidating agent and, after it had replaced the Bank in the pending civil action, removed that action to the United States District Court for the District of Massachusetts. In due course, the FDIC sought, and attained, summary judgment. *See Vasapolli*, 864 F.Supp. at 225. In essence, the lower court found that plaintiffs' claims of fraudulent inducement, misrepresentation, and negligence were barred by the *D'Oench, Duhme* rule and 12 U.S.C. § 1823(e), and that plaintiffs' claims of economic duress and fraud in the factum were rendered nugatory by the lack of a sufficient factual predicate. *See Vasapolli*, 864 F.Supp. at 220–225.

Consistent with these determinations, the court granted *brevis* disposition on all remaining causes of action urged by the plaintiffs against the FDIC. At the same time, the court resolved thirteen counterclaims in the FDIC's favor, and, thereafter, permitted the FDIC to file five more counterclaims, which the court then resolved on the same basis. Finding no satisfactory reason for delay, the court entered a final judgment disposing of all claims and counterclaims between the plaintiffs and the FDIC. *See* Fed. R.Civ.P. 54(b).

The plaintiffs then moved for relief from judgment, asserting for the first time that sums used in a previous Maine proceeding, though incorrectly calculated, were entitled to full faith and credit. The district court denied the motion. This appeal followed.

## II. APPLICABLE LEGAL PRINCIPLES

We set out in somewhat abbreviated form the two sets of legal principles that together electrify the beacon by which we must steer.

### A. *The Summary Judgment Standard.*

■ Summary judgment is appropriate when the record reflects "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For purposes of this determination, the term "genuine" means that "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party...." *United States v. One Parcel of Real Property, Etc. (Great Harbor Neck, New Shoreham, R.I.)*, 960 F.2d 200, 204 (1st Cir.1992). Similarly, the term "material" means that the fact has the potential to "affect the outcome of the suit under the governing law." *Id.* (quoting, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

■ An order granting summary judgment engenders *de novo* review. *See Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993); *Rivera–Muriente v. Agosto–Alicea*, 959 F.2d 349, 352 (1st Cir.1992). In performing this chore, we scrutinize the summary judgment record in the light most congenial to the losing party, and we indulge all reasonable inferences in that party's favor. *See Pagano*, 983 F.2d at 347.

### B. *The D'Oench, Duhme Doctrine.*

■ The FDIC assumes two separate roles when a bank collapses. As receiver, the FDIC manages the failed bank's assets; in its corporate capacity, the FDIC insures the failed bank's deposits. *See Timberland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d 46, 48 (1st Cir.1991) (per curiam). The FDIC's options when the death knell sounds include liquidating the failed bank or, preferably, arranging the purchase and assumption of some or all of its assets and liabilities by a healthy bank. If undue disruption is to be avoided, a purchase and assumption arrangement often must be executed in great haste. It follows, therefore, that both in deciding what course of action to take regarding a failed bank and thereafter in effectuating the course of action chosen, the FDIC must be able to rely confidently on the bank's records as an accurate portrayal of its assets.

■ Mindful of this reality, the Supreme Court more than half a century ago acted to protect the FDIC and the public funds it administers by formulating a special doctrine of estoppel. *See D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed.

956 (1942). The *D'Oench, Duhme* doctrine prohibits bank borrowers and others from relying upon secret pacts or unrecorded side agreements to diminish the FDIC's interest in an asset by, say, attempting to thwart its efforts to collect under promissory notes, guarantees, and kindred instruments acquired from a failed bank.[3] Borrowers' claims and affirmative defenses are treated the same under the doctrine. *See Timberland,* 932 F.2d at 49–50. Of particular pertinence to this case, the secret agreements prohibited by the *D'Oench, Duhme* rule are not limited to promises to perform acts in the future. *See, e.g., Langley v. FDIC,* 484 U.S. 86, 92, 96, 108 S.Ct. 396, 401, 403, 98 L.Ed.2d 340 (1987) (holding that the doctrine extends to conditions to payment of a note, including the truth of express warranties).

## III. ANALYSIS

Appellate courts have no monopoly either on sagacity on clarity of expression. Thus, when a district court produces a cogent, well-reasoned opinion that reaches an eminently correct result, a reviewing tribunal should not write at exceptional length merely to put matters in its own words. *See, e.g., In re San Juan Dupont Plaza Hotel Fire Litig.,* 989 F.2d 36, 38 (1st Cir.1993). So it is here. We, therefore, affirm the judgment for substantially the reasons articulated in the lower court's opinion. We add only a few observations, largely parallel to that court's holdings, to place the facts and controlling legal principles in proper perspective.

*First:* It is settled beyond peradventure that both misrepresentation and fraudulent inducement are within *D'Oench, Duhme*'s sphere of influence. *See Levy v. FDIC,* 7 F.3d 1054, 1057 n. 6 (1st Cir.1993); *McCullough v. FDIC,* 987 F.2d 870, 874 (1st Cir.1993); *In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1346–47 (1st Cir.1992). Undaunted, the plaintiffs argue that *D'Oench* does not apply here for two reasons: because the fraud infected appraisals that form part of the Bank's official records, and because the unusual terms of the transactions should have alerted even a casual reader of those records to the fraud.

Assuming for argument's sake that the transactions were patently bogus, and that a routine analysis of the Bank's records would have indicated as much,[4] this set of circumstances still would not suffice to salvage the plaintiffs' case. The *D'Oench, Duhme* doctrine comes into play to pretermit many transactional claims against the FDIC even when due diligence could easily have unmasked the fraud—and plaintiffs' claims of misrepresentation and fraudulent inducement fall within this generality.

There is, to be sure, an exception for claims that are premised on a breach of an agreement or warranty that is itself contained in the failed bank's records. In this case, however, the plaintiffs have not succeeded in identifying any violation of a specific contractual provision or assurance contained in the Bank's records. It follows inexorably that the district court properly invoked the *D'Oench, Duhme* doctrine in

3. Congress subsequently codified the *D'Oench, Duhme* doctrine. The codification provides:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—
> (1) is in writing,
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
> (4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C.A. § 1823(e) (West 1989). It remains an open question whether the judicially created doctrine and its statutory counterpart are coterminous. *See Bateman v. FDIC,* 970 F.2d 924, 926–27 (1st Cir.1992). This appeal does not require us to probe the point. Accordingly, we shall use phrases like "the *D'Oench, Duhme* doctrine" to refer indiscriminately both to the judicially spawned doctrine and to its statutory reincarnation.

4. We hasten to add that, given Rostoff's wiliness, this assumption seems something of a stretch.

granting summary judgment to the FDIC despite the plaintiffs' claims of misrepresentation and fraudulent inducement. *See McCullough,* 987 F.2d at 873–74; *604 Columbus,* 968 F.2d at 1346–47.

**Second:** Conventional wisdom holds that claims or affirmative defenses premised on duress are within the orbit of, and barred by, the *D'Oench, Duhme* rule. *See, e.g., Newton v. Uniwest Fin. Corp.,* 967 F.2d 340, 347 (9th Cir.1992) (holding that duress renders an agreement voidable, not void, and that the *D'Oench, Duhme* rule applies to agreements that are voidable); *Bell & Murphy & Assocs. v. Interfirst Bank Gateway, N.A.,* 894 F.2d 750, 754 (5th Cir.) (holding that the presence of economic duress is irrelevant to the operation of the *D'Oench, Duhme* rule), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990). A few courts have suggested that, in certain circumstances, claims of duress can escape the clutches of the *D'Oench, Duhme* doctrine. *See, e.g., Desmond v. FDIC,* 798 F.Supp. 829, 836–39 (D.Mass.1992) (distinguishing between duress in the negotiating process and "external" duress, and applying the *D'Oench, Duhme* doctrine only to the former); *see also RTC v. Ruggiero,* 977 F.2d 309, 314 (7th Cir.1992) (declining to reach question of whether duress is covered by *D'Oench* ); *FDIC v. Morley,* 867 F.2d 1381, 1385 n. 5 (11th Cir.) (similar; citing district court cases on both sides of the proposition), *cert. denied,* 493 U.S. 819, 110 S.Ct. 75, 107 L.Ed.2d 41 (1989); *cf. RTC v. North Bridge Assocs., Inc.,* 22 F.3d 1198, 1208 (1st Cir.1994) (permitting further discovery anent duress despite RTC's argument that *D'Oench* bars such a defense).

The plaintiffs invite us to lurch into this wilderness, asserting that their case exemplifies the sort of "external duress" that can sidestep the *D'Oench, Duhme* rule. We decline the invitation. The short, dispositive reason for refusing to embark on this journey is that the facts of this case, even when viewed most sympathetically to the plaintiffs, cannot support a finding of duress.

Under Massachusetts law, a party claiming duress can prevail if he shows that (1) "he has been the victim of a wrongful or unlawful act or threat" of a kind that (2)

"deprives the victim of his unfettered will" with the result that (3) he was "compelled to make a disproportionate exchange of values." *International Underwater Contractors, Inc. v. New England Tel. & Tel. Co.,* 8 Mass.App. Ct. 340, 393 N.E.2d 968, 970 (1979) (citations omitted). Alternatively, a party claiming duress can prevail by showing:

> (1) That [he] involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party.

*Ismert & Assocs., Inc. v. New England Mut. Life Ins. Co.,* 801 F.2d 536, 544 (1st Cir.1986) (citations omitted).

Here, the plaintiffs seek to ground their duress claim on the high-pressure atmosphere of the closings and the lack of sufficient time to examine the closing documents. This is simply not the type and kind of duress that Massachusetts law credits. Coercion and fear, rather than greed, are the stuff of duress. Thus, the authorities are consentient that the presence of a profit motive negates the coercion or fear that is a *sine qua non* for a finding of duress. *See* 13 Samuel Williston, *A Treatise on the Law of Contracts* § 1604 (3d ed. 1970); *see also Coveney v. President & Trustees of Coll. of Holy Cross,* 388 Mass. 16, 445 N.E.2d 136, 140 (1983). Since any pressure that permeated the closings took a toll only because the plaintiffs feared losing out on a potentially profitable business opportunity, their claim of duress is a mirage.

In the alternative, plaintiffs assert that the prospect of losing their deposits created coercion. But even if they felt this fear, the threat, at worst, was that they would have to bring a legal action to recover their deposits, not that the deposits would be lost altogether. We concur with the lower court, 864 F.Supp. at 221–23, that the circumstances of the closings, taken in the light most favorable to the plaintiffs, could not constitute legally cognizable duress. *See, e.g., Ismert,* 801 F.2d at 549–50; *International Halliwell Mines, Ltd. v. Continental Copper & Steel Indus., Inc.,* 544 F.2d 105, 108–09

(2d Cir.1976). Hence, the district court appropriately granted summary judgment on this issue.[5]

 **Third:** Relying on *New Connecticut Bank & Trust Co. v. Stadium Mgmt. Corp.*, 132 B.R. 205, 210 (D.Mass.1991), a case which held that the *D'Oench, Duhme* rule does not prohibit claims for negligent impairment of the collateral securing a loan, the plaintiffs assign error to the district court's conclusion that plaintiffs' claims for negligent misrepresentation are barred. Though we eschew comment on the correctness of *New Connecticut Bank*, we nonetheless reject plaintiffs' asseveration.

*New Connecticut Bank* involved guarantors who alleged negligence on the part of a financial institution in its exercise of control over the operations of the company whose loans had been guaranteed. *Id.* at 207 n. 1. The case at hand is readily distinguishable, for the plaintiffs' claims of negligence are based on alleged misrepresentations relating to the formation of an agreement with the bank. In this sense, then, plaintiffs' claims are fundamentally different from those asserted in *New Connecticut Bank*.

 Moreover, negligent misrepresentations and intentional misrepresentations are sisters under the skin. Each partakes of the flavor of the secret agreements at which the *D'Oench, Duhme* rule is aimed. And plaintiffs cannot evade the rule by the simple expedient of creatively relabelling what are essentially misrepresentation claims as claims of negligence. *See generally McCullough*, 987 F.2d at 873 (extending § 1823(e) to cover misrepresentation by omission so that parties cannot avoid the statute's effect by "artful pleading"); *cf. Dopp v. Pritzker*, 38 F.3d 1239, 1245 (1st Cir.1994) ("[M]erely calling a dandelion an orchid does not make it suitable for a corsage."). To hold otherwise would defy common sense and eviscerate the *D'Oench, Duhme* doctrine.

Because plaintiffs' claims of negligence are nothing more than a rehash of their pretermitted misrepresentation claims, the distr.:t court appropriately granted the FDIC's motion for *brevis* disposition of those claims. *See, e.g., McCullough*, 987 F.2d at 873; *604 Columbus*, 968 F.2d at 1346–47.

 **Fourth:** A claim premised on fraud in the factum is not foreclosed by the *D'Oench, Duhme* rule. *See Langley*, 484 U.S. at 93–94, 108 S.Ct. at 402–03. The plaintiffs attempt to squeeze within this isthmian exception. Despite their strenuous efforts, they have presented no adequate showing that the skulduggery of which they complain amounted to fraud in the factum. We explain briefly.

 Fraud in the factum occurs when a party is tricked into signing an instrument without knowledge of its true nature or contents. *See id.* at 93, 108 S.Ct. at 402. Thus, to constitute fraud in the factum a misrepresentation must go to the essential character of the document signed, not merely to its terms. *See 604 Columbus*, 968 F.2d at 1346–47 (citing other cases). For example, if a person signs a contract, having been led to believe that it is only a receipt, the stage may be set for the emergence of fraud in the factum.

 Here, the plaintiffs allege that they were the victims of fraud in the factum because they thought they were signing long-term notes when they actually signed short-term notes. We agree with the district court, *see Vasapolli*, 864 F.Supp. at 224, that this alleged disparity goes to the transactional terms, not to the very nature of the agreements. Since it is not disputed that the plaintiffs knew they were signing promissory notes, the Bank's conduct, even if unscrupulous, cannot be deemed fraud in the factum. Accordingly, the district court lawfully grant-

---

**5.** The plaintiffs' claim of duress is flawed in another respect as well. A contract signed under duress is voidable, but not automatically void. *See Newton*, 967 F.2d at 347; *DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 633–34 (2d Cir.1982), *cert. denied*, 461 U.S. 915, 103 S.Ct. 1896, 77

L.Ed.2d 285 (1983). By accepting the funds and failing to seek a remedy based on duress within a reasonable time after executing the notes, the plaintiffs forfeited any entitlement to relief on this basis. *See In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir.1989).

ed summary judgment against the plaintiffs on this issue.

**Fifth:** Following the entry of judgment, the plaintiffs moved under Fed. R.Civ.P. 60(b)(6) for relief from the judgment. The district court treated the motion as a motion to alter or amend the judgment under Fed.R.Civ.P. 59(e). We agree both with the district court's approach and with its recharacterization. In addressing a post-judgment motion, a court is not bound by the label that the movant fastens to it. If circumstances warrant, the court may disregard the movant's taxonomy and reclassify the motion as its substance suggests. *See Vargas v. Gonzalez,* 975 F.2d 916, 917 (1st Cir. 1992). That is the case here.

In their motion, the plaintiffs hinted at some unhappiness with the use of Massachusetts law to calculate amounts due on mortgage notes relating to certain properties in Maine.[6] The plaintiffs also made a more specific claim in regard to two borrowers, asserting that the amounts calculated in a prior Maine proceeding must be accorded full faith and credit in the instant case.[7] *See* 28 U.S.C. § 1738 (1988).

We need not reach questions of whether Maine or Massachusetts law governs the calculation of deficiency amounts, or of whether the two plaintiffs are entitled to the benefit of the errors committed in the course of the earlier action. We review a trial court's decision denying a Rule 59(e) motion to alter or amend a judgment for manifest abuse of discretion, *see Appeal of Sun Pipe Line Co.,* 831 F.2d 22, 24–25 (1st Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988), and we discern no hint of any such abuse in this instance.

It is crystal clear that the plaintiffs were aware of the earlier Maine actions at and after the time when the FDIC first moved for summary judgment. Throughout the time between the FDIC's first motion for summary judgment and the entry of final judgment—a period that lasted over one year—the plaintiffs failed either to request that the court apply Maine law in lieu of Massachusetts law, or to raise the "full faith and credit" argument. These ideas surfaced only after the district court ruled against the plaintiffs and entered final judgment. This was too late.

The plaintiffs have offered no plausible reason for waiting until after the entry of judgment to inform the court of the prior proceedings or to object to the amounts claimed all along by the FDIC. By like token, having briefed and argued all pertinent state-law issues in terms of Massachusetts law, plaintiffs have no basis for condemning the district court's unwillingness to take a second look after it had entered final judgment. *See Fashion House, Inc. v. K Mart Corp.,* 892 F.2d 1076, 1095 (1st Cir. 1989) (explaining that courts will hold parties to positions advanced before judgment regarding choice of law).

Unlike the Emperor Nero, litigants cannot fiddle as Rome burns. A party who sits in silence, withholds potentially relevant information, allows his opponent to configure the summary judgment record, and acquiesces in a particular choice of law does so at his peril. In the circumstances of this case, we cannot say that the district court's refusal to grant the plaintiffs' post-judgment motion constituted an abuse of discretion. *See Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 n. 3 (1st Cir.1993) (affirming denial of relief under Rule 59(e) where the information on which the movant relied was neither unknown nor unavailable when the opposition to summary judgment was filed), *cert. denied,* —— U.S. ——, 114 S.Ct. 2133, 128 L.Ed.2d 863 (1994); *Fragoso v. Lopez,* 991 F.2d 878, 887–88 (1st Cir.1993) (explaining that the district court is justified in denying a Rule 59(e) motion that relies on previously

---

6. When a mortgagee purchases foreclosed property at public sale, Maine law limits deficiency amounts to the difference between the fair market value of the mortgaged property at the time of public sale and the amount that the court determines is due on the mortgage. *See* Me.Rev. Stat.Ann. tit. 14, § 6324 (West 1980 & Supp. 1993).

7. In regard to this aspect of plaintiffs' motion, it appears that the FDIC's attorney made an error in the handling of the Maine foreclosure actions. As a result, the Maine judgments understated the liability of these two borrowers.

undisclosed facts when the movant knew of the facts, yet, without a good excuse, failed to proffer them in a timeous manner); *FDIC v. World Univ. Inc.*, 978 F.2d 10, 16 (1st Cir. 1992) (holding that the district court has discretion to deny a Rule 59(e) motion that rests on grounds "which could, and should, have been [advanced] before judgment issued") (citation omitted).[8]

## IV. CONCLUSION

We need go no further. In the end, the plaintiffs' proposed causes of action are either barred, or unsubstantiated, or both. Hence, the district court did not err in concluding that the plaintiffs had failed to demonstrate a trialworthy issue on their direct claims. By the same token, the court committed no error in holding that the plaintiffs, as counterdefendants, had exhibited no valid defense against the FDIC's particularized demands for money due.

*Affirmed.*

**8.** Even if plaintiffs' post-judgment motion were to be considered under Rule 60(b)(6) rather than Rule 59(e), the outcome would be the same. *See Perez–Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 284 (1st Cir.1993) (concluding that, absent exceptional circumstances, motions under Rule 60(b)(6) must raise issues not available to the moving party prior to the time final judgment entered); *see also Rodriguez–Antuna v. Chase Manhattan Bank Corp.*, 871 F.2d 1, 3 (1st Cir. 1989) (holding that abuse-of-discretion standard applies in reviewing trial court's disposition of Rule 60(b) motions).