NE Comm. Dev. Group v. FDIC          CV-92-236-JD  06/06/95  P

UNITED STATES DISTRICT COURT FOR THE
                         DISTRICT OF NEW HAMPSHIRE


Northeast Community Development
Group, et al.

     v.                                    Civil No. 92-236-JD

Federal Deposit Insurance
Corporation, et al.


                              O R D E R


     The plaintiffs, Northeast Community Development Group

("Northeast"), CCI Associates ("CCI"), Concord Comfort Inn, Inc.

("Inn, Inc."), Stephen M. Duprey, Timothy M. Duprey, and

Christopher W. Duprey, bring this action against the defendants,

Federal Deposit Insurance Corporation (FDIC), as liquidating

agent and/or receiver of New Hampshire Savings Bank ("Bank"), and

New Dartmouth Bank ("NDB"), now or formerly as servicing agent

for the FDIC and/or as successor to or assignee of the Bank or

the FDIC,[1] pursuant to 12 U.S.C. § 1819(b) and 28 U.S.C. §§ 1331,

_____

     [1]The plaintiffs allege

          [NDB] . . . . now or formerly served as the Servicing
          Agent for FDIC and now or formerly is or was, or may be
          or may have been, the successor to or assignee of the
          Bank or the FDIC with respect to some or all of the
          Loans.

     Amended Complaint, ¶ 11.  In their answers, the defendants

          den[y] that the term "Servicing Agent" accurately
          describes any relationship which [NDB] has had with the

1345, 1367, 2201 and 2202, seeking damages for breach of contract, negligent misrepresentation, fraud in the factum, promissory estoppel, equitable estoppel and breach of the New Hampshire Consumer Protection Act, New Hampshire Revised Statutes Annotated ("RSA") ch. 358-A (1984 & Supp. 1994) (Counts I-IX). The plaintiffs also seek a declaratory judgment to establish complete defenses of setoff, recoupment, counterclaim, accord and satisfaction, waiver and estoppel, and the statute of limitations, with respect to certain loans made by the Bank to the plaintiffs (Count X). Before the court are (1) the FDIC's motion for summary judgment as to each of the claims and defenses in the amended complaint except for the claim for declaratory relief as to the statute of limitations ("FDIC's Motion for Summary Judgment") (document no. 63); (2) NDB's motion for summary judgment as to each of the claims and defenses in the amended complaint except for the claim for declaratory relief as to the statute of limitations ("NDB's Motion for Summary

---

FDIC in any of its capacities.

NDB's Answer to Amended Complaint, ¶ 11; FDIC's Answer to Amended Complaint, ¶ 11.

2

Judgment") (document no. 64);[2] and (3) the plaintiffs' motion for summary judgment as to Count X (document no. 69).

## Background

On October 10, 1991, the FDIC was appointed as the liquidating agent to act as receiver of the Bank, in which capacity it is the successor to the Bank's rights, titles, powers and privileges with respect to the loans at issue. 12 U.S.C.A. § 1821(d)(2)(A). The FDIC "entered into a purchase-and-assumption transaction with [NDB] as the assuming bank." Defendants' Memorandum, Exhibit A (Affidavit of [Banc One New Hampshire Asset Management Corporation ("BONHAM") employee] Robert Thunstrom) ("Thunstrom Aff."), ¶ 3.

### I. The Governor's Woods Loan

In 1987 the Bank entered into one or more loan agreements with Northeast for a project located in Concord, New Hampshire, known as Governor's Woods. According to the plaintiffs, the Bank

---

[2]The court notes that the motions for summary judgment contained in documents 63 and 64 are based on identical legal grounds. Compare Memorandum of Law of Defendants FDIC and New Dartmouth Bank in Support of their Motions for Summary Judgment (document no. 65) ("Defendants' Memorandum") with Joint Supplemental Memorandum of Defendants FDIC and New Dartmouth Bank in Support of their Respective Motions for Summary Judgment (document no. 76) ("Defendants' Joint Supplemental Memorandum").

3

"entered into a development, construction and working capital loan with Northeast" for the Governor's Woods project in the amount of $2,350,000 ("Governor's Woods Loan").  Amended Complaint, ¶ 19.  Payment for the amount due under the Governor's Woods Loan was guaranteed by plaintiffs Timothy Duprey, Christopher Duprey, and Stephen Duprey.  The plaintiffs allege the loan agreement and other loan documents for the Governor's Woods Loan "permitted and were intended to provide for the payment of accrued interest through additional loan advances." Id.

The plaintiffs allege that in early 1989 the Bank "breached its agreement and course of dealing to fund interest payments from the Governor's Woods Loan and induced Northeast to fund the debt service on the Governor's Woods Project from Northeast's own internal and affiliate sources."  Amended Complaint, ¶ 20.  The plaintiffs have not presented the court with evidence of a written agreement signed by the Bank in which the Bank is committed to fund interest payments from the Governor's Woods Loan, rather they state that "the loan documents permitted the funding of interest payments with advances from the line of credit," Plaintiffs' Objection Memorandum at 15 (emphasis added), that "[t]he Bank committed to allowing [Northeast] to make interest payments in this manner," id. at 16, and that "the

4

Bank's officers made this commitment as a part of their course of dealing." Id. (emphasis added).

The plaintiffs have submitted copies of the Bank's Investment Committee minutes dated January 19, 1988, and March 15, 1988. Plaintiffs' Supplemental Memorandum of Law Examining Newly Disclosed Information in Support of Plaintiffs' Objections to the Defendants' Motions for Summary Judgment ("Plaintiffs' Supplemental Memorandum"), Supplemental Exhibits 1-2 (Bank Document Numbers 060418 and 060416) (January 19, 1988, minutes) and 3-4 (Bank Document Numbers 059876 and 059870) (March 15, 1988, minutes). These minutes reflect votes by the committee to approve changes in the status of certain portfolio loans. Id. The January 19 minutes state:

> The following properties were released from mortgage securing loans:
> . . .
>
> December 24, 1987 - Loan #05048, 05049 - Northeast Community Development Group - realty in Concord - consideration $283,848.91 - balance revolving - no valuation - no new monthly payment.

Supplemental Exhibit 2. The March 15, 1988, minutes state:

> February 10, 1988 - Loan #05048, #05059 - Northeast Community Development Group - realty in Concord - consideration $162,237.74 - revolving balance - no valuation - no new monthly payment.

Supplemental Exhibit 4. The plaintiffs contend that these minutes "confirm the approval of the conversion of the Governor's

5

Woods Loan to a revolving note, and document that the Bank was not expecting or requiring the Plaintiffs to make any new monthly payments, including interest payments." Plaintiffs' Supplemental Memorandum at 2.

The plaintiffs further allege that a duly authorized loan officer of the Bank made "explicit promises that if Northeast funded the Governor's Woods Loan through June 30, 1989 and if Northeast proceeded with other actions in the liquidation of its Loans, the Bank would make future accommodations to and for the benefit of Northeast and the other Plaintiffs." Amended Complaint, ¶ 21. The plaintiffs allege that they "relied on these promises by exhausting Northeast's working capital and other liquid assets to meet the interest payments through June of 1989, by drastically reducing staff and other operating expenses and by undertaking exhaustive efforts to sell, lease or otherwise maximize the value of Northeast's assets." Id., ¶ 22.

A search of the Bank's documents pertaining to the Governor's Woods Loan conducted by BONHAM employee Robert Thunstrom, Thunstrom Aff., ¶ 6, and FDIC[3] employees Mary Moody, Defendants' Memorandum, Exhibit B (Affidavit of Mary Moody)

_____

[3]The Bank's documents regarding the loans at issue are contained at the BONHAM facility at 77 Sundial Avenue in Manchester, New Hampshire, and at the FDIC's facilities in East Hartford, Connecticut, and vicinity. Affidavit of Robert Thunstrom, ¶ 4.

6

("Moody Aff."), ¶ 5, and Robert Newby, Defendants' Memorandum, Exhibit C (Affidavit of Robert Newby) ("Newby Aff."), ¶ 5, failed to produce any written agreement signed by the Bank which specifically sets forth (1) any commitment or promise by the Bank "to provide for the payment of accrued interest through additional loan advances," Thunstrom Aff., ¶ 9; Moody Aff., ¶ 7; Newby Aff., ¶ 7; (2) any commitment or promise by the Bank "to fund interest payments from [the Governor's Woods Loan]," Thunstrom Aff., ¶ 10; Moody Aff., ¶ 8; Newby Aff., ¶ 8; (3) any commitment or promise by the Bank" to make future accommodations to and for the benefit of Northeast and the other plaintiffs," Thunstrom Aff., ¶ 11; Moody Aff., ¶ 9; Newby Aff., ¶ 9; or "'the Bank's separate promise of further accommodations to and for the benefit of Plaintiffs,'" Thunstrom Aff., ¶ 12 (quoting Amended Complaint, ¶ 24); Moody Aff., ¶ 10 (same); Newby Aff., ¶ 10 (same) or (4) "'the Bank's further promise and agreement to approve and follow the Liquidation Plan'", Thunstrom Aff., ¶ 12 (quoting Amended Complaint, ¶ 24); Moody Aff., ¶ 10 (same); Newby Aff., ¶ 10 (same).

## II.  Loans Related to the "Hotel"

The plaintiffs allege that on or about May 17, 1988, the Bank entered into a loan agreement with CCI and Inn, Inc. ("Hotel

Loan") to finance the construction and operation of the Concord Comfort Inn ("Hotel") located in Concord, New Hampshire. Amended Complaint, ¶ 27. According to the plaintiffs, "[t]he Hotel Loan was guaranteed by each of the Dupreys." Id.

The plaintiffs further allege that this loan agreement included an undertaking by the Bank to provide a $150,000 working capital loan or line of credit ("Hotel Working Capital Loan") to CCI and Inn, Inc. Id., ¶ 28. The plaintiffs allege that "[w]ith the full knowledge and consent of the Bank [they] relied on these agreements and commenced and completed construction of the Hotel before completing the final documentation of the Hotel Working Capital Loan." Id., ¶ 29. The plaintiffs also allege that they "commenced operations at the Hotel before completion of the final documentation for the Hotel Working Capital Loan" based on "further assurances" by the Bank that it would fund the Hotel Working Capital Loan. Id., ¶ 30. The plaintiffs allege that despite these assurances the Bank refused to make or fund the Hotel Working Capital Loan. Id., ¶ 31.

A search of the Bank's documents pertaining to the loans related to the Hotel conducted by BONHAM employee Robert Thunstrom and FDIC employees Mary Moody and Robert Newby failed to produce any written agreement signed by the Bank which specifically sets forth (1) "'an undertaking by the Bank to

8

provide a working capital loan or line of credit to CCI and Inn, Inc. in the amount of $150,000" Thunstrom Aff., ¶ 14 (quoting Amended Complaint, ¶ 28); Moody Aff., ¶ 12 (same); Newby Aff., ¶ 12 (same);[4] or (2) "any `further assurances,' `repeated assurances,' or `promises' by the Bank that `the Bank would fund the Hotel Working Capital Loan . . .' or that `the Hotel Working Capital Loan would be finalized and funded."  Thunstrom Aff., ¶ 15 (quoting Amended Complaint, ¶¶ 30-31;  Moody Aff., ¶ 13 (same); Newby Aff., ¶ 13.

Regarding the alleged Hotel Working Capital Loan, the plaintiffs have presented no evidence of a written agreement signed by the Bank in which the Bank is committed to providing a $150,000 working capital loan or line of credit, rather the plaintiffs assert that "[i]n the ordinary course of business, the Bank's loan officers, acting within the scope of their Director-approved authority . . . committed to make working capital loans to CCI, as so contemplated by the loan documents."  Plaintiffs' Objection Memorandum at 17.

---

[4]"Plaintiffs refer to this alleged undertaking as the 'Hotel Working Capital Loan.'"  Id.

III.  The Liquidation Plan

The plaintiffs allege that during the period from October through December of 1989 they proposed in writing, and the Bank accepted, a liquidation plan which provided for

> the orderly sale by Northeast and/or the Bank of virtually all projects (including the Governor's Woods Project but excluding the Hotel) in which the Bank held a mortgage or other interest, in consideration for the settlement and satisfaction of all debt and other obligations owed by Plaintiffs and/or their affiliates to the Bank [("Liquidation Plan")].

Amended Complaint, ¶ 34.  The debt and obligations at issue included the Governor's Woods Loan, the Hotel Working Capital Loan, and other loans originated by the bank to Northeast, CCI, the Dupreys and their affiliates between 1980 and 1988 (collectively referred to as "Loans").  Id., ¶ 33.

The plaintiffs allege they "carried out"  the Liquidation Plan

> and confirmed in writing with the Bank, [NDB], and/or the FDIC or their agents in April 1990, that all deficiency claims would be converted to specified fixed, limited-recourse obligations (which after such restructuring would be without recourse to the individual assets of the Dupreys).

Amended Complaint, ¶ 35.  The plaintiffs allege that in subsequent correspondence they further confirmed these promises.  Id., ¶ 36.  The plaintiffs allege that "the Bank, its successors, receivers, agents and/or assigns ha[ve] dishonored this agreement and continue[] to seek payment/collection of the previously

10

satisfied Loans," id., ¶ 37, and that the defendants "each ha[ve] claimed and/or still claim[] that the Plaintiffs and/or their affiliates are still liable and obligated on a deficiency claim with respect to the foregoing Loans in the approximate aggregate of $3 million." Id., ¶ 38. The plaintiffs further allege that each of the defendants has "breached the terms, conditions and other provisions of [the] Liquidation Plan." Id., ¶ 25.

Documents in the Bank's files indicate that a number of lots at the Governor's Woods project were sold by Northeast at auction in December 1989. According to the plaintiffs, the Bank compelled Northeast to sell such lots "at less than their fair value." Amended Complaint, ¶ 23. The plaintiffs allege that they complied with this requirement, "but only in consideration for the Bank's separate promise of further accommodations to and for the benefit of Plaintiffs and the Bank's further promise and agreement to approve and follow" the Liquidation Plan. Id., ¶¶ 24, 34.

A search of the Bank's documents conducted by BONHAM employee Robert Thunstrom and FDIC employees Mary Moody and Robert Newby failed to produce (1) any written agreement signed by the Bank which specifically sets forth "terms providing that `the orderly sale by Northeast and/or the Bank of virtually all projects (including the Governor's Woods Project but excluding

11

the Hotel) in which the Bank held a mortgage or other interest . . .' is `in consideration for the settlement and satisfaction of all debt or other obligations owed by Plaintiffs and/or their affiliates to the Bank." Thunstrom Aff., ¶ 17 (quoting Amended Complaint, ¶ 34); Moody Aff., ¶ 15 (same); Newby Aff., ¶ 15 (same); (2) any written agreement signed by the Bank, the FDIC or NDB which specifically sets forth "terms providing that `all deficiency claims would be converted to specified fixed, limited-recourse obligations (which after such restructuring would be without recourse to the individual assets of the Dupreys),'" Thunstrom Aff., ¶¶ 18, 19 (quoting Amended Complaint, ¶ 35); Moody Aff., ¶¶ 16, 17 (same); Newby Aff., ¶ 16, 17 (same).

The plaintiffs assert that the Liquidation Plan "was developed in three stages," Plaintiffs' Objection Memorandum at 19, and consisted of an "Initial Workout Plan" purportedly contained in Exhibits 11, 12 and 13, id. at 19, a "Workout Plan" purportedly contained in Plaintiffs' Exhibits 16, 16-1, 17 and 18, id., and a "Final Plan" purportedly contained in Plaintiffs' Exhibit 27. Id. at 20. None of the documents comprising Exhibits 11-13 contain the Liquidation Plan terms alleged in the Amended Complaint. None of the documents comprising Plaintiffs' Exhibits 16, 16-1, 17, 18, and 27 constitute a written agreement

12

signed by the Bank.  The plaintiffs assert that "the Workout Plan was clearly executed by the Bank . . . because the plan was carried out and performed, when the Bank overtly received and accepted the cash benefits of the Final Plan."  Plaintiffs' Objection Memorandum at 19.  The plaintiffs further contend that "[t]he Bank's loan officers accepted th[e] Final Plan, in the ordinary course of their authorized duties . . . through their verbal representations, conduct and acquiescence," id. at 20, and that "[t]he Plaintiffs further confirmed the Bank's acceptance of this Final Plan in their correspondence to the Bank dated October 18, 1990."  Id. at 21 (emphasis added).

In his affidavit, Stephen Duprey states,

> 21.  In connection with the Liquidation Plan, it has become clear that at the time that we proposed it and during its implementation, we did not have knowledge of the true purpose of the Bank and its officers in approving and implementing of [sic] such Plan.  It has only become clear to me in the period since October 1991 that the true nature of the Plan, as envisioned by NDB, that FDIC and their agents, was to deny the validity and effectiveness of the non-recourse features of the Liquidation Plan.

> . . .

> 24.  It was not until October 1991, after the Bank had failed and the FDIC had taken over, that we learned for the first time that the successor holder(s) and/or servicer(s) of the Loans did not intend to honor the non-recourse terms and conditions of the Liquidation Plan.  Officials or representatives of New Dartmouth Bank, the FDIC and BONHAM from time to time and at various times then made it clear that they intended to enforce the original loan terms without regard to the

13

amendments that we and the Bank had executed and performed. In this regard, New Dartmouth Bank, the FDIC and BONHAM breached their duties and obligations under the loan documents to us.

Plaintiffs' Objection Memorandum, Exhibit C (Affidavit of Stephen Duprey), ¶¶ 21, 24.


## Discussion

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The burden is on the moving party to establish the lack of a genuine, material factual issue, and the court must view the record in the light most favorable to the nonmovant, according the nonmovant all beneficial inferences discernable from the evidence." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993) (citations omitted), cert. denied, 115 S. Ct. 56 (1994). Once the moving party has met its burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial[,]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56 (e)), or suffer the "swing of the summary judgment scythe." Jardines Bacata, Ltd. v. Diaz-Marquez, 878 F.2d 1555, 1561 (1st Cir. 1989). "In

14

this context, `genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party, <u>Anderson</u>, 477 U.S. at 248; `material' means that the fact is one `that might affect the outcome of the suit under the governing law.'" <u>United States v. One Parcel of Real Property</u>, 960 F.2d 200, 204 (1st Cir. 1992) (quoting <u>Anderson</u>, 477 U.S. at 248).

### I.   The D'Oench Doctrine

> In <u>D'Oench[, Duhme & Co. v. FDIC</u>, 315 U.S. 447 (1942)], the Supreme Court held that in a suit brought by the FDIC to collect on a borrower's promissory note, in which the FDIC was successor in interest to the original lender, the borrower was not entitled to rely on agreements outside the documents contained in the lender bank's records to defeat the FDIC's claim.  315 U.S. at 460-61 . . . The Supreme Court announced a federal common law doctrine of equitable estoppel preventing the borrower from using a "secret agreement" with the original lender as a defense to the FDIC's demand for payment.  <u>Id.</u>  <u>D'Oench</u> did not require that the borrower have an intent to defraud: "The test is whether the note was designed to deceive creditors or the public authority, or would tend to have that effect. . . ." <u>Id.</u> at 460.

<u>In re Columbus Ave. Realty Trust</u>, 968 F.2d 1332, 1344 (1st Cir. 1992).  "The <u>D'Oench Duhme</u> doctrine prohibits bank borrowers and others from relying upon secret pacts or unrecorded side agreements to diminish the FDIC's interest in an asset by, say, attempting to thwart its efforts to collect under promissory notes, guarantees, and kindred instruments from a failed bank."

15

*Vasapolli v. Rostoff*, 39 F.3d 27, 33 (1st Cir. 1994).

"Borrowers' claims and affirmative defenses are treated the same

under the [*D'Oench Duhme*] doctrine."  *Id.*

> Re-examination and elaboration of the *D'Oench* doctrine
> have expanded it far "beyond the factual background of
> the *D'Oench* case itself, so that it `now applies in
> virtually all cases where a federal depository
> institution regulatory agency is confronted with an
> agreement not documented in the institution's
> records.'" *OPS Shopping Center, Inc. v. FDIC*, 992 F.2d
> 306, 308 (11th Cir. 1993) (quoting *Baumann [v. Savers
> Fed. Sav. & Loan Ass'n*, 934 F.2d 1506, 1510 (11th Cir.
> 1991), *cert. denied*, 112 S. Ct. 1936 (1992)]).

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 593 (11th

Cir. 1995).  "In particular, *D'Oench* bars the use of unrecorded

agreements between the borrower and the bank as the basis for

defenses or claims against the FDIC.  The agreement need not

implicate a specific obligation, such as a note or other asset

held by the FDIC.  Simply put, transactions not reflected on the

bank's books do not appear on the judicial radar screen." *Bowen

v. FDIC*, 915 F.2d 1013, 1015-16 (5th Cir. 1990).

"[The] requirements of *D'Oench* are not met where written

provisions reflect only [an] intent to loan additional funds but

not [an] obligation to do so." *Sweeney v. Resolution Trust

Corporation*, 16 F.3d 1, 5 (1st Cir. 1994), *cert. denied*, 115 S.

Ct. 291 (1994).  The *D'Oench* doctrine bars any defense to an FDIC

claim where such defense is not reflected in "a reasonably

explicit written agreement in [the failed bank's] records." *FDIC*

v. Bay Street Development Corp., 32 F.3d 636, 639 (1st Cir. 1994)

(emphasis in original).

"D'Oench, Duhme can be applied for the benefit of an

assignee or a transferee/purchaser from FDIC." Federal Sav. &

Loan Ins. Corp. v. Griffin, 935 F.2d 691, 698 (5th Cir. 1991),

cert. denied, 502 U.S. 1092 (1992).

> "The D'Oench doctrine also applies to transferee banks
> for essentially the same reason it applies to the FDIC.
> See Porras v. Petroplex Sav. Ass'n, 903 F.2d 379, 381
> (5th Cir. 1990) (D'Oench promotes purchase and
> assumption transactions by offering the purchaser
> protection from secret agreements); Federal Deposit
> Ins. Corp. v. Newhart, 892 F.2d 47, 49-50 (8th Cir.
> 1989) (without the protection of D'Oench, the market
> for assets of a failed bank would be greatly diminished
> because prospective purchasers would have little or no
> incentive to acquire their assets)."

Community Bank of the Ozarks v. FDIC, 984 F.2d 254, 257 (8th Cir.

1993).


II.   Section 1823(e)

In relevant part, title 12 U.S.C.A. § 1823(e)[5] provides,

**(e) Agreements against interests of Corporation**

**(1) In general**

> No agreement which tends to diminish or defeat the
> interest of the Corporation in any asset acquired by it

___

[5]"[S]ection 1823(e) is 'somewhat loosely described as the codification' of the D'Oench doctrine." Villafane-Neriz v. FDIC, 20 F.3d 35, 37 n. 1 (1st Cir. 1994) (quoting McCullough v. FDIC, 987 F.2d 870, 874 (1st Cir. 1993)).

under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement--

    **(A)** is in writing,

    **(B)** was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

    **(C)** was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

    **(D)** has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C.A. § 1823(e)(1) (Supp. 1995).[6]

Pursuant to 12 U.S.C.A. § 1821(9)(A), "any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially

---

[6]The remaining portion of section 1823(e) provides,

**(2) Public deposits**

    An agreement to provide for the lawful collateralization of deposits of a Federal, State, or local governmental entity or of any depositor referred to in section 1821(a)(2) of this title shall not be deemed to be invalid pursuant to paragraph (1)(B) solely because such agreement was not executed contemporaneously with the acquisition of the collateral or with any changes in the collateral made in accordance with such agreement.

12 U.S.C.A. § 1823(e)(2) (Supp. 1995).

comprise, a claim against the receiver or the Corporation."  12

U.S.C.A. § 1821(9)(A) (West 1989).

"One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets."  Langley v. FDIC, 484 U.S. 86, 91 (1987).

> A second purpose of § 1823(e) is implicit in its requirements that the "agreement" not merely be on file in the bank's records at the time of an examination, but also have been executed and become a bank record "contemporaneously" with the making of the note and have been approved by officially recorded action of the bank's board or loan committee.  These latter requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.

Langley, 484 U.S. at 92.

"The common meaning of the word `agreement' must be assigned to its usage in § 1823(e) if that section is to fulfill its intended purposes."  Langley v. FDIC, 484 U.S. at 91.  Therefore, the word "agreement" in section 1823(e) is not limited to an express promise to perform an act in the future but includes the bargain of the parties as reflected in the conditions upon their performance.  Id.  "Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of performance of a counterpromise (as in

19

D'Oench, Duhme) or of the truthfulness of a warranted fact."  Id. at 93.

Although the word "executed" in section 1823(e) can "have two meanings:  (1) that both sides have fully performed any obligations contained in the agreement; and (2) that both sides have signed the agreement," Twin Const., Inc. v. Boca Raton, Inc., 925 F.2d 378, 384 (11th Cir. 1991), the purposes of section 1823(e) and the D'Oench doctrine require that for purposes of section 1823(e), "`executed' must mean that the depository institution has `signed' the agreement."  Id.  "[A]n unsigned document might mislead the banking authority," id., and "[a]t the very least . . . makes it very difficult for bank examiners . . . to determine whether the banking authority will be bound."  Id. Further, "[i]f a bank has not signed a document that purports to impose on it certain obligations, there is no clear evidence that the bank considered the obligations, much less that it prudently considered them."  Id.  Section 1823(e) sets forth a "categorical recording scheme."  Langley v. FDIC, 484 U.S. at 95. "The short of the matter is that Congress opted for the certainty of the requirements set forth in § 1823(e).  An agreement that meets them prevails even if the FDIC did not know of it; and an agreement that does not meet them fails even if the FDIC knew." Id.

20

III. The "No Asset" Exception

"The `no asset' exception to D'Oench, Duhme and 1823(e) is widely recognized." FDIC v. McFarland, 33 F.3d 532, 537 (5th Cir. 1994) (citing see, e.g., FDIC v. Zook Bros. Constr. Co., 973 F.2d 1448, 1452 (9th Cir. 1992); Commerce Federal Savings Bank v. FDIC, 872 F.2d 1240, 1244 (6th Cir. 1989); Beighly v. FDIC, 868 F.2d 776 (5th Cir. 1989); FDIC v. P.L.M. International, Inc., 834 F.2d 248 (1st Cir. 1987); Howell v. Continental Credit Corp., 655 F.2d 743 (7th Cir. 1981); cf. Langley v. FDIC, 484 U.S. 86, 93-94 (1987)). "The `no asset' exception is generally defined as precluding the application of 1823(e) where `the parties contend that no asset exists or an asset is invalid and that such invalidity is caused by acts independent of any understanding or side agreement.'" FDIC v. McFarland, 33 F.3d 532, 537 (5th Cir. 1994) (quoting FDIC v. Merchants Nat'l Bank, 725 F.2d 634, 639 (11th Cir. 1984), cert. denied, 469 U.S. 829 (1984)). "The `no asset' exception will not . . . be applied where the agreement is not reflected in the official records of the bank. An overriding concern of § 1823 and D'Oench is that FDIC be able to rely on the official records of the bank. Therefore, when a defendant seeks to apply the `no asset' exception based on an unrecorded agreement, the exception will not apply." FDIC v. McFarland, 33 F.3d at 537-38.

IV. FDIC's Motion for Summary Judgment; NDB's Motion for Summary Judgment; Plaintiffs' Motion for Summary Judgment as to Count X

The defendants assert that 12 U.S.C. §§ 1821(d)(9)(A) and 1823(e) bar all of the plaintiffs' claims "except the claims regarding loan arrangments with respect to the Hotel (Counts III and IV, and the portions of Counts IX and X regarding the Hotel), and the claim for declaratory relief regarding the statute of limitations." Defendants' Memorandum at 18 (emphasis in original). The defendants further assert that the D'Oench doctrine bars "all of the plaintiffs' claims except the claim for declaratory relief regarding the statute of limitations."[7] Id. (emphasis in original). In response, the plaintiffs contend that the evidence before the court is sufficient to satisfy the requirements of section 1823(e) and the D'Oench doctrine with respect to each of these counts. Plaintiffs' Memorandum of Law in Support of Plaintiffs' Objections to Defendants' Motions for Summary Judgment ("Plaintiffs' Objection Memorandum").

A. Contract Claims

In Count I the plaintiffs allege claims for breach of contract based on "(a) the Bank's breach of its agreement to fund

_____

[7]This claim will be addressed in a subsequent order.

interest payments on the Governor's Woods Loan; (b) the Bank's further breach of its promise to make accommodations to and for the benefit of the Plaintiffs; and (c) the Bank's breach of its agreement to approve and follow the Liquidation Plan."  Amended Complaint, ¶ 42.

In Count III the plaintiffs allege claims for breach of contract for the Bank's alleged breach of its agreement to provide and fund the Hotel Working Capital Loan.  Amended Complaint, ¶ 48.

In Count V the plaintiffs allege claims for breach of contract based on "(a) the Bank's breach of its agreement to approve and follow the Liquidation Plan; (b) the Bank's further breach of its promise to convert the Loans to specific fixed, limited recourse obligations; and (c) the Bank's breach of its agreement that the Loans would be without recourse to the individual assets of the Dupreys."  Amended Complaint, ¶ 54.

In Count VII the plaintiffs seek recovery upon a claim of promissory estoppel based on alleged promises by the Bank, NDB and FDIC "regarding approval of the Liquidation Plan and conversion of the Loans so that they would be without recourse to the Dupreys and with only limited recourse against the other Plaintiffs."  Amended Complaint, ¶ 60.

23

#### 1. The Alleged Agreement to Fund Interest Payments on the Governor's Woods Loan

The court finds that the plaintiffs have failed to present evidence sufficient for a finding that there exists a written agreement signed by the Bank which sets forth a commitment or promise by the Bank to fund interest payments from the Governor's Woods Loan. Accordingly, the claim in Count I for breach of the alleged agreement to fund interest payments on the Governor's Woods Loan is barred by section 1823(e)(1) and the D'Oench doctrine.

#### 2. The Alleged Promise to Make Accommodations to and for the Benefit of the Plaintiffs

The court finds that the plaintiffs have failed to present evidence sufficient for a finding that there exists a written agreement signed by the Bank which sets forth a commitment or promise by the Bank to make accommodations to and for the benefit of the plaintiffs. Accordingly, the claim in Count I for breach of the alleged promise to make accommodations to and for the benefit of the plaintiffs is barred by section 1823(e)(1) and the D'Oench doctrine.

### 3. The Alleged Agreement to Approve and Follow the Liquidation Plan

The court finds that the plaintiffs have failed to present evidence sufficient for a finding that there exists a written agreement signed by the Bank which sets forth a promise by the Bank to approve and follow the Liquidation Plan. Accordingly, the claims in Counts I, V and VII for breach of the alleged agreement to approve and follow the Liquidation Plan are barred by section 1823(e)(1) and the D'Oench doctrine.

### 4. The Alleged Agreement to Provide and Fund the Hotel Working Capital Loan

The court finds that the plaintiffs have failed to present evidence sufficient for a finding that there exists a written agreement signed by the Bank which sets forth (1) an undertaking by the Bank to provide a working capital loan or line of credit to CCI and Inn, Inc. in the amount of $150,000; (2) any commitment or promise by the Bank that it would provide and fund the Hotel Capital Loan. Accordingly, the claim in Count III for breach of the alleged agreement to provide and fund the Hotel Working Capital Loan is barred by section 1823(e)(1) and the D'Oench doctrine.

25

### 5. The Alleged Promise to Convert the Loans to Specific Fixed, Limited Recourse Obligations Which Would be Without Recourse to the Individual Assets of the Dupreys

The court finds that the plaintiffs have failed to present evidence sufficient for a finding that there exists a written agreement signed by the Bank which sets forth terms providing that all deficiency claims would be converted to specific fixed, limited recourse obligations which would be without recourse to the individual assets of the Dupreys. Accordingly, the claims in Counts V and VII for breach of the alleged promise to convert the Loans to specific fixed, limited recourse obligations which would be without recourse to the individual assets of the Dupreys are barred by section 1823(e)(1) and the D'Oench doctrine.

### B. Tort Claims

The D'Oench doctrine "`bars defenses and affirmative claims whether cloaked in terms of contract or tort, as long as those claims arise out of an alleged secret agreement.'" McCullough v. FDIC, 987 F.2d 870, 874 (1st Cir. 1993) (quoting Timberland Design, Inc. v. First Service Bank for Savings, 932 F.2d 46, 50 (1st Cir. 1991)). Likewise, section 1823(e) "`bars defenses and affirmative claims'" arising out of an agreement which fails to meet its requirements "`whether cloaked in contract or tort.'"

McCullough, 987 F.2d at 874 (quoting Timberland Design Inc., 932 F.2d at 50), 874 n. 6.


### 1. Negligent Misrepresentation and Fraud in the Factum

It is settled that claims of misrepresentation and fraudulent inducement are within D'Oench Duhme's sphere of influence." Vasapolli v. Rostoff, 39 F.3d at 33. Claims of negligent misrepresentation "based on alleged misrepresentations relating to the formation of an agreement with [a] bank" are also within the purview of D'Oench. Id. at 35.[8] However, "[a] claim premised on fraud in the factum is not foreclosed by the D'Oench Duhme rule." Id.

> Fraud in the factum occurs when a party is tricked into
> signing an instrument without knowledge of its true
> nature or contents. Thus, to constitute fraud in the
> factum a misrepresentation must go to the essential
> character of the document signed, not merely to its
> terms. For example, if a person signs a contract,
> having been led to believe that it is only a receipt,
> the stage may be set for the emergence of fraud in the
> factum.

---

[8] "[N]egligent misrepresentations and intentional misrepresentations are sisters under the skin. Each partakes of the flavor of the secret agreements at which the D'Oench Duhme rule is aimed. And plaintiffs cannot evade the rule by the simple expedient of creatively relabelling what are essentially misrepresentation claims as claims of negligence. . . . To hold otherwise would defy common sense and eviscerate the D'Oench Duhme doctrine." Vasapolli, 39 F.3d at 35.

<u>Vasapolli</u>, 39 F.3d at 35 (citations omitted).[9]

Counts II, IV, and VI contain claims for negligent misrepresentation and fraud in the factum.  The negligent misrepresentation claims in Count II are based on the defendants' alleged representations "regarding the accommodations that the Bank would make in exchange for Plaintiffs' payment of interest and the auction of the Governor's Woods lots, and the accommodations the Bank, [NDB] and/or the FDIC would make to Plaintiffs in exchange for the approval of the Liquidation Plan." Amended Complaint, ¶ 45.  According to the plaintiffs "these negligent  misrepresentations amounted to fraud in the factum." <u>Id.</u>

The negligent misrepresentation claims in Count IV are based on the defendants' alleged representations "regarding the availability of the Hotel Working Capital Loan after completion of construction of the Hotel."  <u>Id.</u>, ¶ 51.  According to the plaintiffs "those misrepresentations amounted to fraud in the factum."  <u>Id.</u>

---

[9]In <u>Vasapolli</u>, the First Circuit held that the plaintiffs' allegations "that they were victims of fraud in the factum because they thought they were signing long-term notes when they actually signed short-term notes" could not be deemed fraud in the factum because the "alleged disparity goes to the transactional terms, not to the very nature of the agreements." <u>Id.</u>, 39 F.3d at 35.

The negligent misrepresentation claims in Count VI are based on the defendants' alleged representations "regarding approval of the Liquidation Plan and conversion of the Loans so that they would be without recourse to the Dupreys and with only limited recourse against the other Plaintiffs." Amended Complaint, ¶ 57. The plaintiffs allege that "these misrepresentations amounted to fraud in the factum." Id.

The court notes that all of the plaintiffs' claims for negligent misrepresentation are based on alleged misrepresentations relating to the formation of an agreement with the Bank. See Plaintiffs' Objection Memorandum at 27.[10]

---

[10]The plaintiffs assert,

> [t]he Plaintiffs' affidavit establishes that neither Northeast nor [CCI] had knowledge, at the time of closing the 1988 amendment of the Governor's Woods Loan or the Hotel Loan, respectively, of the true nature of the written instruments, or of the novel interpretation now being given to them by NDB and the FDIC. The Plaintiffs reasonably and in good faith believed that the Hotel Loan included an agreement by the Bank to fund a $150,000 working capital loan, and that the 1988 amendment to the Governor's Woods Loan provided for the funding by the Bank of interest payments on that Loan. Nor did the Plaintiffs, in connection with the Liquidation Plan, have knowledge of the true purpose (which has become apparent only in hindsight) of the Bank and the FDIC's agents to deny the validity and effectiveness of the non-recourse feature of the Final Plan.

Plaintiffs' Objection Memorandum at 27 (citing Plaintiffs' Objection Memorandum, Exhibit C (Affidavit of Stephen Duprey), ¶ 21.)

The plaintiffs have failed to present evidence sufficient for a finding that there exists a written agreement signed by the Bank which sets forth either (1) a commitment or promise by the Bank to make accommodations to and for the benefit of the plaintiffs or (2) a promise by the Bank to approve and follow the Liquidation Plan. Thus, the court finds that the negligent misrepresentation claim in Count II is barred by section 1823(e)(1) and the D'Oench doctrine. Considering that the plaintiffs have failed to present evidence sufficient to find that there exists a written agreement signed by the Bank which sets forth either (1) an undertaking by the Bank to provide a working capital loan or line of credit to CCI and Inn, Inc. in the amount of $150,000 or (2) any commitment or promise by the Bank that it would provide and fund the Hotel Capital Loan, the court finds that the claim for negligent misrepresentation in Count IV is barred by section 1823(e)(1) and the D'Oench doctrine.

The plaintiffs have failed to present evidence sufficient for a finding that there exists a written agreement signed by the Bank which sets forth either (1) a promise by the Bank to approve and follow the Liquidation Plan or (2) terms providing that all deficiency claims would be converted to specific fixed, limited recourse obligations which would be without recourse to the

30

individual assets of the Dupreys.  As such, the claims for negligent misrepresentation in Count VI are barred by section 1823(e)(1) and the D'Oench doctrine.

Further, because the plaintiffs have failed to present evidence sufficient for a finding that any of the defendants made a misrepresentation with respect to the essential character of any signed document, the court finds that the defendants are entitled to summary judgment as to the claims in Counts II, IV and VI for fraud in the factum.

### C.   Consumer Protection Act Claims

In Count IX the plaintiffs allege that "[t]he Defendants' acts or practices with respect to the Loans and the Plaintiffs' assets and businesses were and continue to be willfully and knowingly unfair or deceptive, in violation of the New Hampshire Consumer Protection Act, RSA 358-A:2."  Amended Complaint, ¶ 65.[11]

Because (1) the alleged acts or practices with respect to the Loans and the plaintiffs' assets and businesses involve the alleged formation of an agreement between the plaintiffs and the

---

[11]Section 358-A:2 provides, "[i]t shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  (Supp. 1994).

31

Bank and (2) the plaintiffs have failed to present evidence sufficient for a finding that such alleged acts or practices are reflected in a written agreement signed by the Bank, the court finds that the plaintiffs claims for the violation of RSA 358-A:2 are barred by section 1823(e)(1) and the D'Oench doctrine.

D. Equitable Estoppel Claim

Count VIII contains a claim for equitable estoppel based on "the Defendants' representations regarding the approval of the Liquidation Plan and conversion of the Loans so that they would be without recourse to the Dupreys and with only limited recourse against the other Plaintiffs." Amended Complaint, ¶ 63.

Because (1) the representations alleged as the basis for the equitable estoppel claim involve the alleged formation of an agreement between the plaintiffs and the Bank and (2) the plaintiffs have failed to present evidence sufficient for a finding that such representations are reflected in a written agreement signed by the Bank, the court finds that the plaintiffs claim in Count VIII for equitable estoppel is barred by section 1823(e)(1) and the D'Oench doctrine.

32

E.  Count X: Defenses of Setoff, Recoupment, Counterclaim, Accord and Satisfaction, Waiver and Estoppel

In Count X the plaintiffs seek a declaratory judgment "that the Dupreys and other Plaintiffs have no liability to any of [the] Defendants of any kind or in any amount for the Loans," Amended Complaint, ¶ 73, based on the defenses of setoff, recoupment, counterclaim, accord and satisfaction, waiver and estoppel, and the statute of limitations. Id., ¶¶ 69-72.  The defendants' motions for summary judgment address all of these defenses except for that based on the statute of limitations. Despite the multiplicity of defenses alleged in the amended complaint, the plaintiffs' memorandum in support of their motion for summary judgment as to Count X addresses only the accord and satisfaction defense. See Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment with Respect to Count X.  With respect to the defenses at issue, the plaintiffs allege

> 69.  On account of the losses suffered and incurred by Plaintiffs due to Defendants' negligent misrepresentations and breach of its various agreements and promises to Plaintiffs regarding or relating to the Loans, Plaintiffs have a valid offset, setoff, recoupment or counterclaim, for and against the total amounts purportedly due under or with respect to the Loans, which offset, setoff, recoupment or counterclaim, serves as a complete defense to any and all liability of Plaintiffs to any Defendants under or with respect to the Loans.

33

70. Under all the circumstances, the Loans have been satisfied by the common law doctrine of accord and satisfaction, and Defendants are barred from collecting the Loans pursuant to such common law and by the statutory codifications of this doctrine at RSA §§382-A:1-207 and 382-A:9-505.

71. Under all the circumstances, each of the Defendants has waived its rights and is estopped to collect any amounts purportedly due under or with respect to the Loans, which waiver and estoppel serve as a complete defense to any and all liability of Plaintiffs to any Defendants under or with respect to the Loans.

Amended Complaint, ¶¶ 69-71.


### 1. Setoff, Recoupment and/or Counterclaim

The court has ruled, supra, that the plaintiffs' claims for negligent misrepresentation, fraud in the factum and breach of contract are barred by section 1823(e)(1) and the D'Oench doctrine. Accordingly, the court finds that the plaintiffs' claim for a declaratory judgment as set forth in paragraph sixty-nine of the amended complaint, i.e., that they have a valid offset, setoff, recoupment or counterclaim which serves as a complete defense to their liability under the Loans, is likewise barred.


### 2. Waiver and Estoppel

The court has determined that the plaintiffs' claim for equitable estoppel is barred by section 1823(e)(1) and the

34

D'Oench doctrine. Further, the plaintiffs have failed to present evidence sufficient for a finding that any defendant waived its rights with respect to the Loans in a manner which complies with the requirements of section 1823(e)(1) and/or the D'Oench doctrine. Accordingly, the court finds that the plaintiffs' claim for a declaratory judgment as stated in paragraph seventy-one of the amended complaint fails to withstand the defendants' motions for summary judgment.


### 3. Accord and Satisfaction

The plaintiffs assert that the Liquidation Plan constituted an accord and satisfaction between the bank and the plaintiffs which extinguished the Governor's Woods Loan and other Loans except for the non-recourse claims against Plaintiff Northeast. See Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment with Respect to Count X at 2, 6-10, 13, 17-18, 20-26.

"An accord and satisfaction may properly be defined as `a method of discharging a contract, or setting aside a cause of action . . . by substituting for such contract or cause of action an agreement for the satisfaction thereof and the execution of such subsequent agreement.' DeCato Brothers, Inc. v. Westinghouse Credit Corp., 129 N.H. 504, 506, 529 A.2d 952, 953 (1987). "The following are the essential elements of an accord

35

and satisfaction: (1) proper subject matter; (2) competent parties; (3) an assent or meeting of the minds; (4) a consideration." Id., 129 N.H. at 506-07, 529 A.2d at 953.

Because the plaintiffs have failed to present evidence sufficient for a finding that there exists a written agreement signed by the Bank which sets forth a promise by the Bank to approve and follow the Liquidation Plan, the plaintiffs' claim in Count X with respect to the accord and satisfaction issue is barred by section 1823(e)(1) and the D'Oench doctrine.

## Conclusion

For the reasons stated above the court (1) grants the FDIC's Motion for Summary Judgment (document no. 63); (2) grants NDB's Motion for Summary Judgment (document no. 64); and (3) denies the plaintiffs' motion for summary judgment as to Count X (document no. 69).

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

June 6, 1995

cc: Charles A. Szypszak, Esquire
    Steven E. Hengen, Esquire